# United States Court of Appeals
## For the First Circuit

No. 06-1491

CHRISTOPHER ELLEN,

Petitioner, Appellant,

v.

BERNARD BRADY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

David J. Barend for appellant.
Randall E. Ravitz, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, was on brief for appellee.

January 26, 2007

**LIPEZ, Circuit Judge**. In this habeas case, petitioner Christopher Ellen claims that his trial for assault in the Massachusetts Superior Court violated the Due Process Clause of the Fourteenth Amendment because it was tainted by testimony that he remained silent after receiving Miranda warnings. The testimony by the arresting officer was followed by an immediate objection, lengthy discussion between counsel and the court, and, ultimately, a directive from the court that the officer's testimony about Ellen's silence be stricken from the record. The court also gave emphatic instructions to the jury about the importance of the defendant's right against self-incrimination and the state's burden of proof. Ellen claims that, nonetheless, the officer's comment and the court's response violated his due process rights. The Massachusetts Appeals Court rejected Ellen's claim. We conclude that its decision was neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d). Therefore, we affirm the decision of the district court denying habeas relief.

## I.

### A. Factual Background

Adair Rowland lived alone in a house adjacent to Ellen's in Amesbury, Massachusetts. On the evening of Sunday, July 25, 1999, Rowland returned home after attending a dinner party to discover signs of a recent intruder in her bedroom. She phoned a

-2-

friend, turned on a light, and opened her back door. While waiting for her friend in the kitchen, Rowland heard a loud noise and saw a man approaching her. This man, later identified as Ellen, was wearing only a pair of shorts, and he had tube socks over his hands. Ellen hit Rowland in the face, threw her against the counter and then onto the floor. He also shut and locked the back door she had just opened. Ellen then attempted to strangle her, using a sash from her high school prom dress that he had taken from a storage box in the attic.

Suddenly, Ellen ceased strangling Rowland and released her. She asked who he was. He said that he was insane, and that they were both victims. A neighbor heard the commotion in Rowland's kitchen and called the police, who arrived shortly after Ellen stopped his attack. The two officers who arrived at the house first reported that Ellen was sweaty and bloody, and was still wearing only shorts. Rowland was experiencing difficulty breathing, had multiple bruises and abrasions, and appeared to be in shock.

Ellen admitted to the officers that he had hit Rowland but stated that he did not know why he had done so. The officers subsequently searched Rowland's house, and found additional pieces of clothing, taken from her bedroom closet and the storage box in the attic, which were knotted, ripped, tied to furniture, or strewn about. The phone in Rowland's bedroom had been unplugged; the

bulkhead door providing access to Rowland's basement had been wedged open.

Ellen was taken to the Amesbury police station, where he was booked by Officer Ouellet and given <u>Miranda</u> warnings. He declined to make any statements at that time. Ellen was tried in October 2000 on four charges: burglary with assault on an occupant, assault and battery with a dangerous weapon, assault with intent to murder, and assault with intent to rape. At trial, Ouellet testified at length about the chronology of events on the night of the crime. At the end of a series of questions about the <u>Miranda</u> warnings given during the booking process, Ouellet was asked what he said to Ellen or did with him. Ouellet replied, arguably non-responsively, that Ellen declined to make a statement to the police at that time.[1]

---

[1] The relevant portion of the exchange between the prosecutor and Ouellet was as follows:
   Q.  Okay.  As part of the booking process was he given what is known as the <u>Miranda</u> warning?
   A.  Yes, he was.
   Q.  And where does that fit into the procedure of booking?
   A.  Sometimes during booking it can be given at the beginning, the middle, the end, or during.
   Q.  On this particular occasion do you recall when you did that?
   A.  I can't recall exactly when.
   Q.  What procedure did you follow in giving him his <u>Miranda</u> warning?
   A.  He was asked to read his <u>Miranda</u> warning on the board in front of him, the wall beside him, and have him read it along with me as I am reading it from a card to him.
   Q.  Did he read it out loud?
   A.  No.

Immediately after this answer, defense counsel objected and the lawyers and trial judge engaged in a sidebar discussion. Ellen's lawyer requested a mistrial, but the judge asked for argument and some research on the constitutional implications of the prosecutor's question and the officer's answer. While the jury took a recess, the lawyers presented arguments to the judge. After reviewing relevant cases, the judge decided that an immediate curative instruction could resolve the problem and that a mistrial was unnecessary. Defense counsel again objected and argued that an instruction to the jury would exacerbate the error. Nonetheless, the judge recalled the jury, sustained the objection, struck Officer Ouellet's final answer from the record, and gave a lengthy instruction on the burden of proof and the right against self-

---

Q. Did you read it out loud to him?
A. Yes.
Q. After each warning did you ask him if he had any questions?
A. Yes.
Q. Did he respond to that?
A. Yes.
Q. Did he have any questions?
A. He had no questions.
Q. After completing the Miranda warning, did you read off a small green card?
A. Yes.
Q. And that is the procedure you use at the Amesbury Police Station?
A. Correct.
Q. At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?
A. On the bottom of the card is, you know, Do you wish to speak to me now, is on the bottom of it. And on that, when I asked him to sign it, he printed the word no, and signed the card.

incrimination.  The judge also explicitly told the jurors that they could not draw any adverse inferences from the challenged testimony.[2]  Defense counsel unsuccessfully renewed his motion for a mistrial.

Ellen's defense was that he experienced a dissociative episode on the night in question, and thus was not guilty by reason of insanity.  He testified that he had no memory of his entry into

---

[2]  Since the particular language of the instruction is relevant to our subsequent legal analysis, we include an excerpt of the instruction here.

Just before we broke, there was a question that was asked by the prosecutor with regard to Mr. Ellen being given his so-called Miranda rights. . . .  And one of those [constitutional] principles is that we are presumed, should we be charged with a crime, we are presumed to be innocent, and that we cannot be forced to testify against ourselves.

In other words, we have protection against incrimination, self-incrimination.  And those are very important principles of law that I touched on briefly, will define and discuss in more detail at the end of the case. . . .

And so the defendant doesn't have to do anything.  No defendant in a criminal case has to do anything when they're charged.  They don't have to present witnesses, they don't have to present exhibits, they don't have to, they don't have to say anything. . . .

And what goes with that is that when someone chooses to avail themselves of that important constitutional right . . . that should never be used against you.  A jury should never say, well, you know, he said he didn't want to talk, that must mean something.  That would be wrong.  And so that was an improper question that was put to the witness to the extent the witness responded and said, and gave the answer that he did.

So what I'm going to do is strike that answer that you heard from the police officer and tell you and instruct you that you are to disregard that.  And I wanted you to understand why. . . .

Rowland's house, or of his attack on her.  Ellen also offered the testimony of a psychiatrist who described various traumas in Ellen's past.  The psychiatrist opined that Ellen experienced two prior incidents that were consistent with a diagnosis of dissociative episodes, and that Ellen's behavior and symptoms on July 25, 1999 were indicative of a third dissociative episode.  After Officer Ouellet's testimony and the judge's curative instruction, no other reference was made to Ellen's post-Miranda silence, either by a witness, or in the prosecutor's closing argument.

## B.  Procedural Background

Ellen's conviction on three of the assault charges was affirmed by the Massachusetts Appeals Court.[3]  The state court held that Ouellet's disclosure that Ellen declined to speak to the police after being given his Miranda warnings was not error because the testimony was stricken from the record and the judge gave a curative instruction.  Commonwealth v. Ellen, 797 N.E.2d 946, 946 (Mass. App. Ct. 2003) (unpublished).  Because the court found no error, it did not discuss the issue of prejudice to the defendant.[4]

---

[3] The trial court entered judgment as a matter of law for the defendant on the charge of assault with intent to rape.

[4] Ellen also argued to the state appeals court that the prosecutor made numerous inappropriate comments in his closing argument and that there was insufficient evidence to support the nighttime element of the burglary charge.  797 N.E.2d at 946.  The court rejected both of these claims as well.

Ellen's application to the Supreme Judicial Court for further appellate review was denied.

Ellen filed a petition for a writ of habeas corpus in the district court, claiming only that Officer Ouellet's disclosure of his post-Miranda silence and the trial court's response to it was a violation of his due process rights. The district court denied the petition in a brief ruling from the bench. The court also granted a certificate of appealability "as to the Issue of Post-Miranda Silence" and Ellen filed this appeal.

**II.**

We review the district court's denial of habeas relief de novo. See, e.g., Caputo v. Nelson, 455 F.3d 45, 49 (1st Cir. 2006). The question we must address is whether the Massachusetts Appeals Court's finding that no constitutional error occurred was either contrary to, or an unreasonable application of, clearly established federal case law. 28 U.S.C. § 2254(d)(1).[5] We must first identify what constitutes the relevant "clearly established Federal law, as determined by the Supreme Court." Id. We will then consider whether the Appeals Court's decision was "contrary

---

[5] The Antiterrorism and Effective Death Penalty Act ("AEDPA") also provides for habeas relief if a federal court finds that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Ellen has not claimed that the state court made any unreasonable factual determinations. Therefore, § 2254(d)(2) is not applicable here.

-8-

to" that law, as that term has been narrowly defined by the Supreme Court. Finally, we will examine whether the state court decision was an unreasonable application of the clearly established law. In making this evaluation of the state court's decision, we do not focus on the quality of the court's reasoning but rather on the reasonableness of the outcome. Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) ("The ultimate question on habeas, however, is not how well reasoned the state court decision is, but whether the outcome is reasonable.").

## A. The "Clearly Established" Law

We begin with a brief survey of the relevant "clearly established" federal law at the time of the state court's decision. Williams v. Taylor, 529 U.S. 362, 379 (2000) (citing 28 U.S.C. § 2254(d)(1)). Our inquiry into whether a particular legal rule is clearly established is de novo. The federal courts "must make an independent evaluation of the precedent existing at the time the state conviction became final." Wright v. West, 505 U.S. 277, 305 (1992) (O'Connor, J., concurring in the judgment).

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that an individual's exercise of his right against self-incrimination cannot be used against him. Id. at 468 n.37 ("In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not,

-9-

therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."). It has long been clear, therefore, that a defendant's silence in response to the prophylactic Miranda warnings cannot be used as substantive evidence of his guilt. Id.

In Doyle v. Ohio, 426 U.S. 610 (1976), the two defendants claimed in their separate trials that they had been framed by a government informant. Given this defense, the prosecutor asked during extensive cross-examination of each defendant why he said nothing about being framed at the time of his arrest. Id. at 613-14. The prosecutor repeatedly asked the defendants whether they had "told [the arresting officer] all about what happened to [them]" and why they didn't "protest [their] innocence." Id. The state claimed that these questions by the prosecutor were a justified form of impeachment because the defendants were offering at trial a new exculpatory account of the events. Id. at 616-17.

The Supreme Court rejected the state's attempt to distinguish impeachment from substantive evidence of guilt, holding that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Id. at 619. The Court based its decision on the assurances of fairness implicit in the Miranda warnings:

> [W]hile it is true that the Miranda warnings contain no express assurance that silence will

-10-

carry no penalty, such assurance is implicit
to any person who receives the warnings. In
such circumstances, it would be fundamentally
unfair and a deprivation of due process to
allow the arrested person's silence to be used
to impeach an explanation subsequently offered
at trial.

Id. at 618.

The Supreme Court held the Doyle rationale equally applicable where the prosecutor seeks to use evidence of a defendant's post-Miranda silence as evidence of the defendant's mental state. In Wainwright v. Greenfield, 474 U.S. 284 (1986), the prosecutor asked each of the two arresting officers about the multiple occasions on which the defendant invoked his right to remain silent following the Miranda warnings. Id. at 286-87. There, the defendant pled not guilty by reason of insanity, and the prosecutor sought to show that his decision to remain silent after arrest demonstrated his mental competence. Id. at 287. The Supreme Court reaffirmed its reasoning in Doyle, citing the unfairness of promising "an arrested person that his silence will not be used against him and thereafter [] breach[ing] that promise by using the silence to impeach his trial testimony." Id. at 292. The Court concluded that the same unfairness would result from using post-Miranda silence as evidence of sanity: "[t]he implicit promise, the breach, and the consequent penalty are identical in both situations." Id.

-11-

However, mere reference to a defendant's post-Miranda silence does not necessarily amount to a due process violation.  In Greer v. Miller, 483 U.S. 756 (1987), the prosecutor's second question to the defendant was "Why didn't you tell this story to anybody when you got arrested?".  Id. at 759.  Defense counsel objected to the question before the defendant could answer.  The judge sustained the objection and instructed the jury to ignore the question, but gave no explanation for the ruling.  The trial continued without further reference to the defendant's silence after receiving the Miranda warnings.  The Supreme Court held that there was no due process violation in these circumstances because "[t]he fact of [the defendant's] postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference."  Id. at 764-65.

We draw from Greer this proposition: in cases where a prosecutor refers to the defendant's post-Miranda silence in a question to a witness or a statement to the jury, or elicits testimony about such silence from a witness, and the offending question, statement or testimony is promptly addressed by the court, in an instruction to disregard and/or strike from the record, there may not necessarily be a Doyle violation because the government has not been permitted to "use" the defendant's silence against him.  This is a case-by-case determination, as Greer made clear.  Id. at 764 n.5.  The majority in Greer explicitly stated

-12-

that its decision was not based on the absence of prejudice to the defendant. Instead, its ruling addressed the existence of a constitutional error in the first place. Id. at 761 n.3 (noting that the decision was not based on the "harmless-error" standard, but on the "fundamental question" whether "an error of constitutional dimension occurred").

These Supreme Court decisions comprise the core of "clearly established" federal law governing the state's use at trial of a defendant's post-Miranda silence. We turn now to an examination of whether the Massachusetts Appeals Court's decision was either contrary to or an unreasonable application of this law.

**B. Was the Appeals Court's Decision "Contrary to" Federal Law?**

A federal court may provide habeas relief to a state court prisoner where the state court proceedings "resulted in a decision that was contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1). In Williams v. Taylor, 529 U.S. 362, the Supreme Court explained the two ways in which a state court decision might be "contrary to" federal law. First, a state court decision that applies an incorrect legal standard, or misstates the rule articulated in a Supreme Court case, will be "contrary to" clearly established Supreme Court precedent. Id. at 405. The Court was careful to define "incorrect," saying that it requires a legal standard that is "substantially different," and thereby "contradictory" or "opposite" to the appropriate standard.

-13-

Id. Second, if the state court "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent," that decision would also be contrary to federal law. Id. at 406.

Ellen's only developed "contrary to" argument relies on the "incorrect legal standard" definition.[6] Here, the Massachusetts Appeals Court did not specifically refer to any Supreme Court precedent in its discussion of the arresting officer's testimony about Ellen's exercise of his right to remain silent after receiving Miranda warnings. 797 N.E.2d at 946. However, the Appeals Court cited to Commonwealth v. Mahdi, 448 N.E.2d 704 (Mass. 1983). Mahdi discusses the Supreme Court's decision in Doyle at some length and accurately recites and applies the rule announced therein. Id. at 713-14. Further, although Mahdi was decided before Wainwright, the Massachusetts Supreme Judicial Court predicted the rule later announced in Wainwright, saying: "[W]e fail to see how use of evidence to infer sanity substantively differs from use to infer guilt . . . . Fundamental unfairness results from the use of evidence of such silence regardless whether the person exercising his or her constitutional

---

[6] Ellen misconstrues the second definition of "contrary to" under Williams. He cites to the differences between his case and Greer; we interpret his argument as one under the "unreasonable application" test.

-14-

right to remain silent claims insanity as a defense." Id. The state court thus accurately stated the governing federal law through its reliance on Mahdi.

## C. Was the Appeals Court's Decision An "Unreasonable Application of" Federal Law?

Federal courts may grant habeas relief to state prisoners who can show that the state court decision in their case involved an "unreasonable application" of clearly established federal law. 28 U.S.C. § 2254(d)(1). As with the "contrary to" provision, we start with the Supreme Court's explanation of this statutory language. In Williams, the Supreme Court held that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." 529 U.S. at 409. The Court continued by noting that "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410. See also McCambridge v. Hall, 303 F.3d 24 (1st Cir. 2002).

The Massachusetts Appeals Court found that no Doyle violation occurred. In Greer, the Supreme Court explained that the hallmark of a Doyle violation is "the use" of the defendant's post-Miranda silence against him, especially where the prosecution is allowed to "'call attention to [the defendant's] silence.'" 483 U.S. at 763 (quoting Doyle, 426 U.S. at 619). The Court went on to say that it was "significant that in each of the cases in which

-15-

this Court has applied Doyle, the trial court has permitted specific inquiry or argument respecting the defendant's post-Miranda silence." Id. at 764. This language suggests that in order to establish the existence of a Doyle violation, the defendant must show that the prosecution used the defendant's post-Miranda silence against him by asking questions, eliciting testimony, or making a statement or argument that invites or encourages the jury to infer guilt (or sanity, as the case may be) from the defendant's silence. The Court's decision in Greer, finding that no Doyle violation occurred, hinged on two key facts: the prosecutor was not permitted to call attention to the defendant's silence (because the defendant's objection to the prosecution's question was promptly sustained and no further mention was made) and no evidence of that silence was submitted to the jury. Id. at 764-65.

This case easily falls within the scope of the reasoning in Greer. As in that case, the court here sustained the first and only objection raising the Doyle issue after Ouellet's testimony that Ellen chose to remain silent; no further references were made to Ellen's silence; and no evidence of that silence was permitted to go to the jury. Although Ellen accurately observes that the prosecutor in his case asked Officer Ouellet a long series of questions regarding the Miranda warnings, there was no reference in that colloquy to Ellen's choice to remain silent until the end of

the inquiry when Ouellet testified, arguably non-responsively, to a vague and open-ended question by the prosecutor.[7]  At no point did the prosecutor directly ask the officer about Ellen's post-warning silence; in fact, the prosecutor's question asked what the officer himself did or said after the Miranda process, not what Ellen did or said.  Therefore, the prosecutor in this case did not make specific inquiry about Ellen's silence, or argue to the jury that his silence should be interpreted as evidence of guilt.

Additionally, the lengthy curative instruction in this case explained to the jurors that no adverse inferences could be drawn from Ellen's silence and that Officer Ouellet's testimony on that point was improper and ought not be given any weight.  The court further told the jury that it was striking Officer Ouellet's answer.  See supra note 2.  In Greer, the judge did not give a curative instruction beyond telling the jurors that the offensive question should be disregarded, perhaps because the prosecutor's accusatory question to the defendant about his silence was objected to and stricken before any answer could be given.  Seizing on this distinction, Ellen claims that the instruction at his trial served to compound the error of Ouellet's disclosure of his post-warning

_____

[7] See supra note 1.  The prosecutor's question was: "At the conclusion of giving him his Miranda warning, what, if anything, did you say or do with him?"  In response, Officer Ouellet responded as follows: "On the bottom of the card is, you know, Do you wish to speak to me now, is on the bottom of it.  And on that, when I asked him to sign it, he printed the word no, and signed the card."

-17-

silence by calling the jurors' attention to it.  However, the Supreme Court noted in Greer that courts should "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it."  483 U.S. at 766 n.8.  On the facts here — a singular reference to the defendant's silence in an arguably non-responsive answer, the presumption of jury adherence to an instruction from the court supports the conclusion that the state court's application of clearly established federal law was not unreasonable.

We emphasize, however, that a curative instruction will not always offset an improper reference to a defendant's post-Miranda silence contained in a question from the prosecution or a statement to the jury, or elicited in testimony by a prosecutor's question.[8]  See, e.g., United States v. Moreno, 185 F.3d 465, 474 (5th Cir. 1999) ("[A] sustained objection followed by a curative instruction is not a panacea.  It may militate against finding a

---

[8] Also, what happened in this case emphasizes the risks for the prosecution if it chooses to ask questions about the Miranda procedure for whatever purpose. Cf. Wainwright, 474 U.S. at 295 (noting that questions regarding the defendant's demeanor or behavior during booking or the administration of Miranda warnings may be permissible, if "carefully framed" to "avoid[] any mention of the defendant's exercise of his constitutional rights"). Indeed, in light of the clear precedent, the prosecutor should have been particularly careful to ensure that Ellen's post-Miranda silence was not mentioned, even in a more responsive answer.  The Supreme Court's decision in Wainwright was published in 1986, fourteen years before this trial.  That decision clearly proscribed any attempt to use Ellen's post-Miranda silence as evidence of his state of mind.

constitutional violation, or become central to the harmless error analysis. But they do not automatically mean no violation has occurred." (citations omitted)). A prosecutor's persistence in referring to the defendant's post-Miranda silence or a trial judge's failure to provide adequate curative instructions may result in a Doyle violation even when no evidence of the defendant's silence is submitted to the jury. This violation issue will, of course, depend on the particular facts of a given case, and will require a case-by-case analysis. See, e.g., Hill v. Turpin, 135 F.3d 1411, 1413-16 (11th Cir. 1998) (finding a Doyle violation where prosecutor repeatedly inquired about and reminded the jury that the defendant remained silent after receiving Miranda warnings, despite the trial judge's repeated instructions to the jury to disregard that fact); United States v. Kallin, 50 F.3d 689, 693-95 (9th Cir. 1995) (finding a Doyle violation, notwithstanding the judge's instruction that the jury disregard any evidence of the defendant's silence, because the instruction was too delayed and unduly emphasized the erroneous testimony).

Here, however, we have none of the concerns reflected in these cases. Ellen's post-Miranda silence was not mentioned, by either the prosecutor or a witness, after the judge sustained the objection to Officer Ouellet's testimony. The prosecutor's questions to the officer did not, on their face, call for testimony in violation of Doyle. The judge's instructions were given

promptly and were proportional to the testimony given by Officer Ouellet.  This case falls squarely within the parameters of <u>Greer</u>. The decision of the Massachusetts Appeals Court that no <u>Doyle</u> violation occurred was not an unreasonable application of clearly established federal law.

<u>Affirmed</u>.