# United States Court of Appeals
## For the First Circuit

No. 06-1288

UNITED STATES,

Appellee,

v.

JOSÉ R. ANDÚJAR-BASCO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Torruella, Circuit Judge,
Lipez, Circuit Judge,
and DiClerico, Jr.,* District Judge.

Rafael F. Castro-Lang for appellant.
G. Andrew Massucco-LaTaif, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, were on brief for appellee.

June 6, 2007

*Of the District of New Hampshire, sitting by designation.

**DICLERICO**, **District Judge**.  A jury convicted José R. Andújar-Basco of conspiring and aiding and abetting the possession with intent to distribute five or more kilograms of cocaine. Andújar seeks a new trial, arguing that the district court erred by not declaring a mistrial (1) after a government witness testified regarding Andújar's election to exercise his Fifth Amendment rights to remain silent and to request an attorney, and (2) after the government made unrelated improper remarks in closing arguments.

## I.

Andújar was ensnared in a Drug Enforcement Agency (DEA) sting operation.  In September 2004, the DEA paid a confidential informant to make purchases of controlled substances.  At the behest of DEA Agents Carlos Galloza and Roberto Bryan, the confidential informant contacted Freddy Cancel-Camacho, an acquaintance he had known for twenty years, to inquire about the purchase of ten kilograms of cocaine.  Prior to the purchase, the informant and Cancel met on multiple occasions and also had several telephone conversations.  The DEA recorded many of these conversations and played them for the jury at trial.

On September 20, Cancel told the informant that the only person he knew who could acquire ten kilograms of cocaine was Andújar.  The informant was also familiar with Andújar because Cancel had introduced the two a few years earlier.  The next day, September 21, the informant went to Cancel's house to discuss the

transaction. While the informant was present with a recording device, Cancel talked to Andújar on the phone. Andújar confirmed that he would sell cocaine to the informant, but he lowered the quantity from ten kilograms to five kilograms and set the purchase price at $85,000. The three agreed to meet the next day to complete the transaction.

The September 22 meeting did not go as planned. When Andújar and Cancel did not arrive at the arranged meeting location at the appointed time, the informant left. While driving home, he received a call from Cancel on his mobile phone. At one point in the conversation, Andújar took the phone from Cancel and told the informant that he had the five kilograms and was ready to go forward with the deal. It was subsequently agreed that Andújar would give the cocaine to Cancel who would then give it to the informant and that Cancel would thereafter bring the $85,000 from the informant to Andújar.

On the morning of September 23, Cancel called the informant and told him that Andújar had given him the cocaine. Cancel instructed the informant to come to his house to exchange the money for the cocaine. The informant and Agent Galloza, posing undercover as the drug buyer financing the purchase, drove to Cancel's house. The informant went inside Cancel's house, took possession of the bag of cocaine, and lead Cancel out to his truck to retrieve the money. After the informant put the cocaine in the

back of the truck, local police and federal agents converged on the scene and arrested the informant, Cancel, and Agent Galloza. A forensic chemist testified that the substance seized that day was cocaine weighing just over five kilograms.

Cancel subsequently agreed to call Andújar to arrange for Andújar's payment. Eddie Vidal, a Puerto Rico police officer assigned to the DEA, recorded and listened to Cancel's three phone conversations with Andújar. In those conversations, Andújar instructed Cancel to meet him at a shopping center parking lot. Cancel, Galloza, Vidal, and other law enforcement personnel drove to the shopping center and waited. Andújar arrived driving a white BMW with two passengers. After Andújar got out of the car and approached a fast food truck, Cancel identified him, and he was arrested. DEA agents also arrested the two other individuals in the white BMW, and conducted a search of the car's interior. Under the driver's seat the agents found a white plastic bag containing 110 individually wrapped clear plastic bags containing a white powdery substance. A forensic chemist testified that the bags contained approximately seventy grams of cocaine.

A grand jury returned a two-count indictment charging Andújar and Cancel with conspiring to possess with intent to distribute five or more kilograms of cocaine, see 21 U.S.C. §§ 841(a)(1) and 846, and aiding and abetting the possession with intent to distribute five or more kilograms of cocaine, see 21

-4-

U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Cancel pled guilty to both charges before trial and was sentenced to seventy-eight months imprisonment. A five-day jury trial ensued on the charges against Andújar in which the government elicited testimony from the confidential informant, Officer Vidal, Agent Bryan, and two forensic chemists. The government also presented several recorded conversations, and testimony and documentary evidence concerning Andújar's and Cancel's phone records. The jury found Andújar guilty on both counts and the district court sentenced him to 121 months in prison. Andújar filed a timely notice of appeal.

**II.**

Andújar argues that two errors necessitate a new trial. First, he contends that the district court erred by not granting a mistrial after the government infringed his Fifth Amendment privilege against self-incrimination by eliciting testimony concerning his election to remain silent and to request an attorney while being questioned by DEA agents. See U.S. Const. amend. V ("No person shall . . . be compelled in any criminal case to be a witness against himself . . ."); Miranda v. Arizona, 384 U.S. 436, 468 n.37 (1966) (holding that a defendant's exercise of his right to remain silent may not be used against him at trial). Andújar argues that this testimony resulted from "intentional government misconduct which was geared to impressing on the [jury] that [he had] refused to talk about the 5 kilo[grams] and wanted a lawyer

-5-

because he was guilty." Second, he contends that his right to a fair trial was "further violated when the prosecutor made repeated, unprovoked[,] improper closing argument[s] to the jury." Andújar argues that the district court should have declared a mistrial after the prosecutor impermissibly interjected his personal opinion and then compounded the error by telling the jurors that it was their "duty" to "uphold the law" and find Andújar guilty.

## A. Improper Testimony

We begin with Andújar's contention that the government elicited improper testimony regarding his election to remain silent and to request an attorney. On the third day of the trial, the government called Agent Bryan who testified about Andújar's arrest and booking. According to Bryan, Andújar was advised of his Miranda rights and indicated his understanding of those rights. Because Andújar did not initially invoke his right to silence, Bryan began questioning him. Bryan testified as follows concerning that interrogation:

> Q. Can you tell the ladies and gentlemen of the jury what, if anything, the defendant told you?
>
> A. Basically we explained the seriousness of the charge that he was looking at and advised him that you know, we have evidence regarding that, and trying to seek his cooperation regarding the next level. . . . At that time we tried to explain to Mr. Andújar the seriousness of the charges, and explain to him this was the particular time that was for him, to be beneficial for him to get on board, what we say, to go ahead and see if we could seek

-6-

<u>the person that he received the five kilograms of cocaine from</u>.

Q. Did he tell you any information pertaining to any of the cocaine that you seized on that day?

A. Before we went straight to the five kilograms, what I initially started with was regarding the cocaine found in the vehicle. At that time he admitted to the fact that he said they, they had just purchased that particular cocaine.

Q. When he said they, who did you take they to be?

A. Himself and the other individuals in the vehicle.

Q. What happened after that?

A. In addition, as I tried to ascertain further information as far as who he actually received the cocaine from, he then changed the statement and said that it was his cocaine and no one else had anything to do with it.

Q. His cocaine being the five kilograms or the 70 grams?

A. At the time we were specifically talking about the cocaine in the vehicle. <u>When attempting to go further or get further details regarding the five kilograms, and also where was the cocaine ascertained from, at that time he didn't want to speak any further, he advised he wanted his lawyer and invoked his Miranda warnings and we stopped</u>.

Q. Did you question him any further after that?

A. No, sir.

Day Three Tr. at 100-03 (emphasis added). Andújar did not object at any point during this line of questioning.

-7-

On the fourth day of the trial, the government recalled Agent Bryan to testify about a phone call DEA agents had made using Andújar's mobile phone the evening after he was arrested. The following colloquy took place:

> Q. Did Richard Andújar have his cellphone with him at the time?
>
> A. No, sir, we had it with us, sir.
>
> Q. Did you have occasion to use his cellphone any time later in the night of September 23, 2004?
>
> A. Yes, I did.
>
> Q. Can you tell the ladies and gentlemen of the jury how you used his cellphone and for what purpose?
>
> A. Yes, sir, <u>after Mr. Andújar was arrested we were attempting to have Mr. Andújar basically what we call get on board</u>, and in order to also keep the other cooperators cool at that particular time–

Day Four Tr. at 5 (emphasis added). At that point, Andújar objected to the testimony concerning "the other cooperators." Andújar requested a mistrial, arguing that the government violated an earlier court order that government witnesses should refrain from suggesting that co-defendant Cancel had cooperated with law enforcement.[1] The court offered to instruct the jury that Cancel

---

[1]Citing Federal Rule of Evidence 403, the court had ruled that any testimony referring to co-defendant Cancel's "cooperation" with law enforcement was overly prejudicial and misleading because Cancel ultimately chose not to cooperate and not to testify at Andújar's trial. The government was ordered to instruct its witnesses not to characterize Cancel as a "cooperator."

did not cooperate. Andújar then argued that Bryan's testimony concerning the DEA's attempt to get Andújar "on board" "seems like . . . he is making a comment on Mr. Andújar's choice to remain silent." The court did not "read that into this testimony" and denied Andújar's request for a mistrial. The court nonetheless struck the testimony from the record.

At the start of the fifth and final day of trial, Andújar again moved, both orally and in a written submission, for a mistrial based on Bryan's testimony that the DEA had attempted to get Andújar "on board." Andújar noted that, although he had objected only once, Bryan had twice testified about the attempt to get Andújar "on board." Andújar did not refer or object to the testimony describing Andújar's termination of the interrogation. The court denied the motion for a mistrial but offered to deliver a curative instruction to the jury. Andújar objected to a specific instruction, which he feared would draw attention to the stricken testimony. Therefore, with the assent of both parties, the court simply delivered an instruction emphasizing that the jury could not consider any testimony that had been stricken from the record.

Andújar now challenges three portions of Bryan's testimony: (1) the day three testimony about attempting to get Andújar "on board," (2) the day three testimony regarding Andújar's explicit invocation of his Fifth Amendment rights, and (3) the day four testimony again mentioning the attempt to get Andújar "on

board." We begin our analysis with consideration of the day three testimony specifically mentioning Andújar's <u>Miranda</u> assertion.

Because Andújar did not raise a contemporaneous objection to this testimony, our review is for plain error only. <u>See</u> <u>United States</u> v. <u>Gabriele</u>, 63 F.3d 61, 70 & n.13 (1st Cir. 1995). For Andújar to prevail under this standard, he must demonstrate that there was an error, that was clear or obvious, and that affected his substantial rights. <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732-34 (1993) (citing Fed. R. Crim. P. 52(b)). If these three conditions are satisfied, the court may reverse to prevent a miscarriage of justice. <u>Id.</u> at 734-35.

The Fifth Amendment forbids the use of a defendant's custodial silence as substantive evidence of his guilt. <u>Miranda</u>, 384 U.S. at 468 n.37. In <u>Doyle</u> v. <u>Ohio</u>, the Supreme Court held that, under the Fourteenth Amendment, where a defendant exercises his right to remain silent after being informed of his <u>Miranda</u> rights, the government may not use that silence to impeach an explanation offered by the defendant at trial. <u>See</u> 426 U.S. 610, 618-19 (1976). In so holding, the Court recognized that allowing the government to use a defendant's silence against him at trial, after having implicitly encouraged that silence through delivery of the <u>Miranda</u> warning, would be "fundamentally unfair and a deprivation of due process." <u>Id.</u> at 618. This court has further held that a defendant's actual statement asserting his <u>Miranda</u>

-10-

rights, even when uttered before a <u>Miranda</u> warning has been delivered, is not admissible as substantive evidence of the defendant's guilt.  See <u>Coppola</u> v. <u>Powell</u>, 878 F.2d 1562, 1567 (1st Cir. 1989) ("[T]he disclosure of the words [the defendant] used to claim his privilege results in the same dilemma addressed" in the Supreme Court cases dealing with prosecutorial reference to a defendant's silence).

The question that arises here is whether the rule announced in <u>Miranda</u> -- that the government may not use the defendant's post-arrest silence in its case-in-chief -- is applicable here, where the defendant initially waived his Fifth Amendment privilege only to assert his right to silence at some later point in the midst of questioning.  As a general rule, any inculpatory or exculpatory statements made by a defendant (including silence with regard to particular questions) are admissible at trial insofar as they were the product of a knowing and voluntary waiver.[2]  See <u>Miranda</u>, 384 U.S. at 475; <u>United States</u> v. <u>Goldman</u>, 563 F.2d 501, 503 (1st Cir. 1977) ("A defendant cannot have it both ways.  If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to.") (internal quotation marks omitted).  But waiver, in this

_____

[2]Andújar does not argue that his waiver was not made knowingly and voluntarily.

context, is not an all-or-nothing proposition.  As the Supreme Court noted in Miranda, "where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated."  384 U.S. at 475-76.  The Court was explicit that a detained suspect may change his mind about talking to the police "at any time prior to or during questioning," and that the "right to cut off questioning," is essential to the privilege.  Id. at 473-74.

The government cites a line of Eighth Circuit cases that hold that testimony regarding a defendant's refusal to speak to the police, following an initial Miranda waiver, is admissible against the defendant.  See United States v. Burns, 276 F.3d 439, 442 (8th Cir. 2002) ("[W]here the accused initially waives his or her right to remain silent and agrees to questioning, but 'subsequently refuses to answer further questions, the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused.'") (quoting United States v. Harris, 956 F.2d 177, 181 (8th Cir. 1992), and citing United States v. Collins, 652 F.2d 735, 739 (8th Cir. 1981)).  See also Rowan v. Owens, 752 F.2d 1186, 1190 (7th Cir. 1984) (Posner, J.) (finding that, on the facts of that case, the government's testimony concerning the end of the interrogation was permissible).

-12-

Andújar argues that his case is distinguishable from the above cases because the challenged testimony here refers directly to his express assertion of his constitutional rights. In the above cases, Andújar argues, the challenged testimony mentioned only the defendant's refusal to answer further questions. See Burns, 276 F.3d at 441 (federal agent testified that the defendant, in response to one particular question, "did not respond and 'just looked' at those questioning him"); Harris, 956 F.2d at 181 (prosecutor's summation mentioned the defendant's confession and that the defendant thereafter "conclude[d] the interview"); Rowan, 752 F.2d at 1190 (two police officers testified that after the defendant answered some questions he "said he didn't want to say anything else"); Collins, 652 F.2d at 740 (officers testified that after making an incriminating statement, the defendant "refused to make any other statement"). In contrast, Andújar argues, Bryan's testimony explicitly noted that Andújar had asked for a lawyer and had "invoked his Miranda warnings."

Andújar raises a meaningful distinction. It has long been established that a witness who has been compelled to testify may avoid a question on Fifth Amendment grounds only if the answer would pose "some authentic danger of incrimination." United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997). In light of the self-evident purpose of the privilege against self-incrimination, a government witness's testimony that an accused explicitly invoked

-13-

the privilege raises a nearly irresistible inference that the accused was hiding something incriminating. Put another way, although silence may be interpreted in many ways, see Doyle, 426 U.S. at 617 ("every post-arrest silence is insolubly ambiguous"), the affirmative assertion of the privilege against self-incrimination raises a clear inference of culpability. Accordingly, since such testimony more directly implies that the defendant was hiding something, it is necessarily more prejudicial than testimony that simply notes that the defendant at some point stopped answering questions. Indeed, the distinction between an affirmative statement and simple silence was one important factor in Coppola. See 878 F.2d at 1566 (distinguishing from Supreme Court precedent upholding the use of pre-arrest silence to impeach a defendant's credibility because, "[i]n the case at bar, we are concerned with the use of a statement made by a suspect and used by the prosecutor in his case in chief, not the use of silence to impeach the defendant's credibility").

More importantly, although Miranda acknowledges the possibility of a knowing and voluntary waiver, neither Miranda, nor any subsequent Supreme Court decision, draws a distinction between an immediate post-arrest Fifth Amendment assertion and a delayed mid-interrogation assertion. In either event, the assertion triggers the privilege, the police must cease interrogation, and the government may not use the assertion against the defendant at

trial.  See Doyle, 426 U.S. at 619; Miranda, 384 U.S. at 468 n.37 ("In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation.  The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.").  At least with respect to clear affirmative assertions, we do not see how an initial Miranda waiver can operate to make a subsequent Miranda assertion admissible against the defendant, nor do we perceive a sound rationale for cutting back the scope of Miranda's protections.  See Coppola, 878 F.2d at 1566 (noting that the privilege against self-incrimination is given liberal application and cautioning against "whittl[ing] it down by the subtle encroachments of judicial opinion") (quoting Maffie v. United States, 209 F.2d 225, 227 (1st Cir. 1954)); see also Castro, 129 F.3d at 229 (recognizing that the privilege against self-incrimination is "a cornerstone of our adversarial system of criminal justice" that "must not be given a crabbed construction").

Whatever the merit of the reasoning of the Eighth Circuit cases, there are limits to how far the government may go in describing the scope of an interrogation.  See Rowan, 752 F.2d at 1190 (recognizing that the police can "indicate . . . the end as well as the beginning of the interrogation, so that the jury [will] know that the officers' testimony [is] complete," "provided [that]

-15-

they [do] not do so with undue emphasis"). Government witnesses who testify concerning the circumstances of an interrogation that was terminated by the defendant must proceed with caution. In the circumstances of this case, we hold that the Fifth Amendment bars testimony concerning a defendant's explicit mid-interrogation assertion of his Miranda rights, and that it was error to permit such testimony to go to the jury.

The government argues, nevertheless, that in light of the Eighth Circuit cases, and a case from this circuit that favorably cites one of those cases, see United States v. Lopez-Lopez, 282 F.3d 1, 12 (1st Cir. 2002) (citing Harris, 956 F.2d at 181), the district court's error was not plain. As noted above, because the Fifth Amendment privilege against self-incrimination "must be given liberal construction," Coppola, 878 F.2d at 1565, any exceptions that undermine its protections should be applied narrowly.

It is important to emphasize that the Eighth Circuit cases did not confront the precise scenario presented here. See supra at 13-14. Neither did Lopez-Lopez. In that case, two co-defendants were questioned together and in response to a specific question, one co-defendant told the other "don't answer." Lopez-Lopez, 282 F.3d at 11. The district court allowed the interrogating officer to testify regarding that statement at the defendants' joint trial. We upheld their convictions, holding that, after an accused knowingly and voluntarily waives his Miranda

-16-

rights by making statements, "he may not rely on Doyle to object to the admission of those statements simply because the statements refer to the act of keeping silent." Id. at 12. As in the Eighth Circuit cases, the testimony challenged in Lopez-Lopez did not describe the defendant expressly electing to exercise his Miranda rights. Moreover, Lopez-Lopez is further distinguishable by the fact that it did not involve an accused asserting his own Miranda rights, but rather involved an accused urging his companion to assert his rights.

In sum, Miranda draws no distinction between a mid-interrogation assertion of the privilege against self-incrimination and an immediate post-arrest assertion, see Miranda, 384 U.S. at 468 n.37 & 475-76, and our holding in Coppola makes it clear that the words the defendant uses to assert the privilege are themselves protected by it, see Coppola, 878 F.2d at 1567-68. We reject the contention that any subsequent cases, of this circuit or of any other circuit, can be read to have carved out an exception to this protection where the express assertion of the privilege comes after a previous waiver. Such an exception would run contrary to Miranda's plain language. Accordingly, we find that it was plain error to allow testimony concerning Andújar's express assertion of his Miranda rights.

Such a finding, however does not end the plain error analysis. Andújar must establish that the error affected his

-17-

"substantial rights by altering the outcome of the trial." United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007). Put another way, he must establish that the error prejudiced him. Given the overwhelming strength of the government's case, we conclude that it did not.

Although the government's case largely hinged on the testimony of a confidential informant, his testimony was corroborated by several sources, including the testimony of Officer Vidal and Agent Bryan, and the recorded conversations between the informant and Cancel. Bryan's and Vidal's testimony, and the substance of the recorded conversations, track the informant's testimony. Moreover, Vidal personally identified Andújar as being on the other end of the calls Cancel made to set up the time and the place for the seller to receive payment for the five kilograms of cocaine. The phone records for Cancel's and Andújar's mobile phones -- which show a number of calls between Cancel and Andújar during the time period of the conspiracy -- further support the informant's story.

The defendant's own actions and statements provide further corroboration. Andújar's very arrival at the appointed time and place designated for the transfer of the $85,000 is strong circumstantial evidence of his involvement in the conspiracy, especially when viewed in context with the other evidence. Moreover, Andújar's post-arrest confession that he was the owner of

-18-

the seventy grams of cocaine found in the white BMW provides additional circumstantial evidence linking Andújar to the conspiracy. Both the quantity and the packaging of the seventy grams of cocaine, in 110 individual plastic bags, were consistent with distribution. See United States v. Puckett, 405 F.3d 589, 601 (7th Cir. 2005) (noting that "63 grams [of cocaine], is in excess of what one would possess for personal use, and is in and of itself sufficient evidence to compel an inference that [the defendant] intended to distribute the drug"). Andújar's possession of the seventy grams -- although not directly probative of his ownership of the five kilograms -- lends credibility to the informant's depiction of Andújar as a drug dealer and undermines the defense testimony aimed at establishing an innocent explanation for Andújar's presence at the shopping center parking lot.

Andújar argues that the credibility of the government's identification is in doubt because the officers who arrested Andújar inquired whether other people at the scene were "Richard." But the fact that the arresting officers may not have known what Andújar looked like hardly undermines the government's case. Admittedly, the DEA relied on Cancel to make a visual identification of the seller, and he did just that. Andújar also argues that "the short duration of calls between Cancel and [Andújar], the lack of certainty as to what was spoken between them during those calls, [and] that there was evidence Cancel had direct

communication with the owners of the narcotics whom he did not identify to the authorities at the time of arrest" further undermines the government's case. Again, however, it is not readily apparent how any of these factors weaken the government's case. It is hardly surprising that a drug dealer would want to minimize the length of his phone conversations concerning an illicit transaction. Nor is the government charged with providing the precise contents of every conversation involved in a conspiracy. In any event, the detailed testimony of the confidential informant, and the testimony of Officer Vidal, who listened in on three of Cancel's calls with Andújar, could hardly be characterized as "uncertain." Finally, that Cancel may have had contact with Andújar's source does not disprove Andújar's participation, especially in light of the testimony that the source trusted only Andújar and would not work directly with anyone else.

We therefore find that Andújar has failed to establish that the error "had [a] prejudicial impact on the jury's deliberations." Olano, 507 U.S. at 734 (internal quotation marks omitted). For the same reason, Andújar's unpreserved challenge to the day three "on board" testimony also fails.

Andújar did, however, object to the day four testimony. Although not perceiving a problem, the district court sustained Andújar's objection, struck the offending testimony from the record, and instructed the jury as requested by Andújar. Thus, the

only question presented on appeal is whether the granting of greater relief (i.e., the declaration of a mistrial) was warranted. Although we ordinarily review de novo the question of whether "a statement in the presence of the jury infringed upon the privilege against self-incrimination," we review the "denial of a motion for mistrial for abuse of discretion." Gabriele, 63 F.3d at 70.

The connection between Bryan's testimony about the DEA's post-arrest "attempt[] to have Mr. Andújar . . . get on board" and Andújar's election to remain silent is tenuous at best. The question posed by the government -- asking Bryan how and for what purpose he had used Andújar's cell phone -- did not call for such testimony. On its face, the testimony itself does not explicitly suggest that Andújar refused to talk to police, nor does it state whether the DEA's "attempt" was ultimately successful. See Lopez-Lopez, 282 F.3d at 12 (finding no Doyle violation where there "was no testimony as to whether [the co-defendant] responded to [the defendant's] suggestion by remaining silent and there was no testimony about either party remaining silent in the face of questioning"). Nor did the government make "a point of asking the jury to draw a negative inference from" the attempt to get Andújar "on board." United States v. Daoud, 741 F.2d 478, 482 (1st Cir. 1984).

Even assuming the jury made the connection Andújar fears, viewing the totality of the circumstances, we do not perceive a

-21-

violation of constitutional magnitude.  In a recent habeas case, we recognized that in cases involving testimony concerning a defendant's post-Miranda silence, where the trial court promptly addresses the improper testimony "in an instruction to disregard and/or strike from the record, there may not necessarily be a Doyle violation because the government has not been permitted to 'use' the defendant's silence against him."  Ellen v. Brady, 475 F.3d 5, 11 (1st Cir. 2007) (citing Greer v. Miller, 483 U.S. 756, 764-65 (1987)).  In Ellen, a government witness, responding to a seemingly innocuous question from the prosecutor, testified concerning the defendant's election not to speak to the police.  Id. at 7.  The defendant immediately objected and the trial court sustained the objection, struck the testimony, and delivered a curative instruction.  Id. at 8.  In light of the surrounding circumstances, we ruled that there was no constitutional violation.  See id. at 12-14.  Important to our consideration were the facts that the defendant's "post-Miranda silence was not mentioned, by either the prosecutor or a witness, after the judge sustained the objection[,]" the government's questions "did not, on their face, call for testimony in violation of Doyle," and the court promptly delivered curative instructions that "were proportional to the" offensive testimony.  Id. at 14.

The same factors are present here.  The district court sustained Andújar's objection and struck the offending testimony

-22-

from the record. Following Andújar's objection, no further questions or testimony alluded to his silence and the government made no comment on his silence in closing arguments. Additionally, the jury was instructed, both at the beginning of the trial and after the close of evidence, that it must not consider any testimony stricken from the record. Following closing arguments, the court, at Andújar's request, again emphasized this point, reminding the jury "that any testimony that you may have seen or heard and that I have excluded from evidence, and instructed you to disregard, is not evidence." The court also instructed the jury that Andújar has a "constitutional right not to testify and no inference of guilt or of anything else, may be drawn from the fact that he did not testify. For any of you to draw such an inference would be wrong, indeed it would be a violation of your oath as a juror." Andújar presents no sound reason to discard "the customary presumption that juries follow their instructions." Gabriele, 63 F.3d at 70; see also Ellen, 475 F.3d at 13.

Andújar argues that we should view the challenged day four testimony in context with the previous improper testimony. Andújar argues that the government purposefully elicited Bryan's improper testimony and the district court should have considered the cumulative effect of all the improper testimony. First, as noted above, we disagree that the government purposefully sought to elicit testimony about Andújar exercising his Fifth Amendment

-23-

privilege. Additionally, it bears emphasizing that this court reviews alleged errors of the district court, not errors of the prosecution, and the district court is not charged with advocating for the defense or anticipating issues not brought to the fore by counsel. Cf. United States v. McIntosh, 380 F.3d 548, 555 (1st Cir. 2004). Andújar never referred the court to the most objectionable testimony directly relating to his Miranda assertion. He only objected to the ambiguous and considerably less striking "on board" testimony. In such circumstances, the court did not abuse its discretion in denying Andújar's motion for a mistrial.[3]

## B. Improper Closing Arguments

Andújar challenges three comments made by the government in closing arguments. First, at the end of his initial summation, the prosecutor stated, "I feel comfortable and the United States feels comfortable that they have proven beyond a reasonable doubt that this man delivered five kilograms of cocaine between the 20 and 23 of September." Day Five Tr. at 39. In rebuttal, the

---

[3]We recognize that, unlike in Ellen, some testimony concerning Andújar's silence was ultimately submitted to the jury. But this state of affairs came about only because of defense counsel's inattention. Once apprised of the problem, the district court acted promptly and reasonably to correct it. We further add that, even under the stricter form of harmless error review applicable to constitutional errors, the government has established beyond any reasonable doubt that the verdict was not influenced by the references to Andújar's Miranda election. United States v. Coker, 433 F.3d 39, 47 (1st Cir. 2005). Based on the overwhelming evidence establishing Andújar's guilt, we are confident that the verdict would have been the same even in the absence of the improper testimony. Id.; see supra at 18-20.

prosecutor argued, inter alia, that Andújar and Cancel "conspired to distribute five kilograms of cocaine, it does not matter where it came from. He gave it to Freddy Cancel. That is what matters. I have proven it, absolutely. We have met our burden." Id. at 59. Finally, in his last words to the jury, the prosecutor urged, "[y]ou find him guilty, you uphold the law, your duty as jurors, make the logical choice and come back with one answer, and telling this man, Richard Andújar you are guilty. Thank you." Id. at 67.

Andújar argues that the first two remarks were improper because they amounted to "affirmations of [the prosecutor's] personal belief" that Andújar is guilty. See United States v. Gonzalez Vargas, 558 F.2d 631, 632-33 (1st Cir. 1977) (vacating a conviction where the prosecutor stated his personal belief in summation). Further inflaming the jurors' passions, Andújar argues, was the prosecutor's final exhortation to the jurors to do "your duty." See United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) (finding improper the suggestion that a jury has "a duty to decide one way or the other" because such an appeal "can only distract a jury from its actual duty: impartiality"). Andújar contends that the severity of these comments warrants a new trial. The government concedes that the comments were improper, but argues

that a new trial is unnecessary because it is not reasonably likely these isolated remarks affected the outcome of the trial.[4]

Since Andújar did not object to the prosecutor's remarks at trial, we may only review for plain error. See United States v. Henderson, 320 F.3d 92, 105 (1st Cir. 2003). The government explicitly concedes error and implicitly concedes that the error was plain. Nevertheless, as we have already noted above, see supra 18-20, 24 n.3, the record, viewed in the aggregate, presents overwhelming evidence establishing Andújar's guilt. In such circumstances, we are compelled to conclude that the prosecutor's improper remarks did not "so poison[] the well that the trial's outcome was likely affected." Henderson, 320 F.3d at 107 (internal quotation marks omitted).[5]

---

[4]The government also argues that Andújar's counsel interjected her own personal opinion in her summation and thereby "neutraliz[ed] the harm flowing from the prosecutor's remarks." United States v. Gallagher, 735 F.2d 641, 644 (1st Cir. 1984). We decline to invoke the "invited response" rule here where the government launched the "opening salvo." United States v. Young, 470 U.S. 1, 12-13 (1985).

[5]Although the lack of prejudice saves the government from a lost conviction, we are troubled that such improper arguments persist despite our repeated admonitions against them. See, e.g., United States v. Martínez-Medina, 279 F.3d 105, 120 (1st Cir. 2002); United States v. Gonzalez-Gonzalez, 136 F.3d 6, 10 (1st Cir. 1998) (collecting cases). The United States Attorney's office in Puerto Rico must redouble its efforts to educate its attorneys about the ground rules for closing arguments.

**III.**

For the foregoing reasons, the defendant's convictions are **affirmed**.