HOWARD, Circuit Judge.
Following a jury trial, defendant-appellant José Valdivia was convicted of conspiracy to possess with intent to distribute one or more kilograms of heroin, 21 U.S.C. §§ 841, 846, and conspiracy to import one or more kilograms of heroin into the United States, 21 U.S.C. §§ 952(a), 963, for which he was sentenced to 210 months’ imprisonment. On appeal, Valdivia contends that the district court committed a litany of errors in (i) denying his motion to dismiss pursuant to the Speedy Trial Act; (ii) making inappropriate comments during trial and providing the jury with misleading instructions; (iii) permitting the government to present inadmissible hearsay and improper overview testimony; (iv) allowing a government fact witness to render expert testimony without the requisite qualification and advance notice; (v) denying multiple requests to suppress foreign wiretap evidence; and (vi) improperly applying the guidelines during sentencing. After careful consideration of Valdivia’s claims, we affirm the judgment below.
I. Background
Drawing from the trial record, and excluding facts the significance of which may depend on the nature of the claim being raised, we recount the relevant factual background in the light most favorable to the verdict. United States v. Gonzalez-Ramirez, 561 F.3d 22, 24 (1st Cir.2009). Due to the fact-specific nature of Valdivia’s array of claims, we reserve additional factual detail for the analysis that follows.
Between October 9, 2001 and April 30, 2003, Valdivia played an integral role in facilitating the distribution efforts of a substantial Aruba-based drug trafficking organization led by one José De Sousa. The scheme, insofar as concerns the prosecution of Valdivia, was relatively simple. De Sousa procured large shipments of heroin from Venezuela and Colombia, significant portions of which were diverted to Valdivia for distribution in Puerto Rico. The drugs were transferred in either of two ways: by strapping, swallowing, or otherwise affixing bags to traveling couriers; or by employing cruise line employees to deliver bicycles, the tires of which were laden with contraband. Valdivia, or his purported right-hand man, Carlos Pabón, obtained the deliveries and arranged for their sale and disbursement throughout the greater San Juan, Puerto Rico area. An associate of De Sousa — typically his close confederate Jeffrey Grueninger — would then make bi-monthly trips to collect the drug proceeds from Valdivia or Pabón. Grueninger, who testified for the government at Valdivia’s trial, estimated that over the course of approximately eighteen months, Valdivia received upwards of 120-125 kilograms of heroin from De Sousa, at an estimated total street value of roughly $5 million.
The operation began to unravel in October 2001, when Giovani Castro — a drug courier for De Sousa, and later a key government witness at Valdivia’s trial— was seized in the San Juan airport, arriving from Aruba with approximately one kilogram of heroin strapped to his legs. Also discovered in his possession was a piece of paper containing two phone numbers — both annotated with the subscript “José” — which Castro claimed were provided to him by José Valdivia in order to *38 arrange delivery of the drugs. A review of the phone records revealed that one of the numbers, while registered to a female subscriber, retained the user name of “José Valdivia.”
Shortly after Castro’s seizure, Aruban authorities initiated an investigation of the De Sousa drug network. They obtained approval from an Aruban court to wiretap De Sousa’s telephones, resulting in the recording of several incriminating conversations between, among others, De Sousa, Grueninger, Valdivia, and Pabón. In January 2003, Grueninger was seized at the Miami International Airport with more than $27,000 in U.S. currency. A few months later De Sousa was arrested, and a subsequent search of his home by Aruban authorities yielded in excess of thirteen kilograms of heroin.
Valdivia was not long to follow; arrested in Puerto Rico on November 18, 2003, he was charged in a two-count criminal complaint with conspiracy to possess with intent to distribute, and import into the United States, one kilogram or more of heroin in violation of 21 U.S.C. §§ 841, 846, 952(a), and 963. A protracted pretrial period ensued, during which both sides filed numerous motions, requested a host of conferences, and engaged in an extended series of unfruitful plea negotiations. Ultimately, at the conclusion of a twelve-day trial that commenced on February 6, 2006, Valdivia was convicted on both counts. This timely appeal followed.
II. Analysis
A. Speedy Trial Act
Valdivia first challenges the district court’s denial of his motion to dismiss pursuant to the Speedy Trial Act (STA).[1] Ordinarily we review such a denial de novo as to legal rulings and for clear error as to factual findings. United States v. Maxwell, 351 F.3d 35, 37 (1st Cir.2003). Here, however, although the parties wage a spirited battle over the applicability of the STA, we conclude in the end that Valdivia’s STA claim has been waived, or at a minimum, forfeited.
The Speedy Trial Act requires that a criminal defendant’s trial commence within seventy days from the filing of the information or indictment, or from the date of the defendant’s initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). Failure to begin the trial within such time shall, upon motion of the defendant, result in dismissal of the charging instrument either with or without prejudice. Id. § 3162(a)(2). The Act, however, excepts certain periods of delay from the STA’s seventy-day clock. Two such exclusions hold particular relevance for this appeal.
The first, set forth in 18 U.S.C. § 3161(h)(1), requires the automatic exclusion of “[a]ny period of delay resulting from other proceedings concerning the defendant, including hut not limited to” eight enumerated subcategories of proceedings.[2] Id. (emphasis added). Although § 3161(h)(1) exclusions often fall within the eight specifically listed subcategories, various non-enumerated delays have also been held to be automatically excluded by virtue of the non-limiting “other proceedings” clause. See, e.g., United States v. Anello, 765 F.2d 253, 256 (1st Cir.1985) (holding that time spent engag *39 ing in collateral proceedings before another district judge attacking the lawfulness of grand jury selection procedures constituted “other proceedings”). The “other proceedings” language, however, is not a carte blanche for post-hoc determinations of excludability. In discerning whether a non-enumerated delay constitutes an “other proceeding,” and therefore warrants automatic exclusion under the STA, several courts have imposed, or at least implied, some limiting restrictions. See, e.g., United States v. Lucky, 569 F.3d 101, 107 (2d Cir.2009) (requiring at least some semblance of “formal judicial process[]” to constitute an “other proceeding”); see also Bloate v. United States, - U.S. -, 130 S.Ct. 1345, 176 L.Ed.2d 54 (2010) (holding that time granted to prepare pretrial motions is not automatically excludable as an “other proceeding” under § 3161(h)(1)).
The second relevant exclusion, § 3161(h)(7)[3] — commonly referred to as the “ends-of-justice” provision — permits the court to exclude delays resulting from continuances granted “on the basis of [the judge’s] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.” 18 U.S.C. § 3161(h)(7)(A). As a permissive, rather than automatic, exclusion, the trial court is required to affirmatively “set[] forth, in the record of the case, either orally or in writing, its reasons” for granting an ends-of-justice continuance. Id. Such findings must be entered into the record by the time a district court rules on a defendant’s motion to dismiss under the STA. Zedner v. United States, 547 U.S. 489, 507, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006).
In this case, 797 days elapsed between Valdivia’s initial appearance on November 25, 2003, and the filing of his January 31, 2006 motion to dismiss on STA grounds. See United States v. Hood, 469 F.3d 7, 9 (1st Cir.2006) (“The [STA] clock ... stops the day the defendant files a motion to dismiss for lack of a speedy trial.”). Despite this labyrinth of pretrial activity, the parties agree that the bulk of this time is properly excluded from the STA calculation. They dispute the excludability of only two potentially dispositive spans of time, which can be broken down for present purposes as follows[4]:
1. August 21, 2004 — November 4, 2004
The district court held pretrial conferences on May 25, June 28, and August 6, 2004 to ascertain the status of ongoing plea negotiations. The minutes from the May 25 and June 28 conferences state, in relevant part, that the parties were granted thirty-day periods to finalize negotiations, and that the court would therefore “toll the speedy trial [act] until [the] next status conference.” The minutes from the August 6 conference also allude to ongoing plea discussions and grant the parties additional time to negotiate. In contrast to the minutes from the two previous conferences, however, the August minutes do not explicitly refer to the Speedy Trial Act, noting only that another status conference would be scheduled for September 23, 2004. On August 20, a pending interlocutory appeal previously filed by Valdivia (the pendency of which had tolled the STA) was denied. Other than the continu *40 ation of plea negotiations, neither the parties nor the district court docket indicate any additional formal activity until November 5, 2004, when Valdivia filed a motion requesting a status conference, again tolling the STA clock.[5] See 18 U.S.C. § 3161(h)(1)(D). The parties dispute whether the period between the denial of the interlocutory appeal on August 20 and the November 5 filing of the motion for a status conference should be excluded.
2. November 10, 200U — November 29, 200Í
On November 9, 2004, the Court held another status conference pursuant to Valdivia’s November 5 request. The minutes note in pertinent part that “[t]he government provided [a] copy of the plea agreement to the defense. [Defense counsel] will review and discuss the same with his client. Since the parties were negotiating a plea agreement in this case, the court has granted the defendant until November 29, 2004 to object [sic] Magistrate Judge’s Report and Recommendation [ ] as to the motion for bill of particulars....”[6] On November 29, 2004, Valdivia filed an objection to the magistrate’s report and recommendation, which once more tolled the STA. See id. Here, the parties dispute the ex-cludability of the time between the November 9 status conference and the filing of objections to the report and recommendation on November 29.
The government advances two theories for excluding these periods of delay. First, it proposes the application of § 3161(h)(7), arguing that the ends of justice served by tolling the STA for plea negotiations that occurred throughout the disputed periods outweigh the interests of according the defendant and the public a speedy trial. The problem with this argument is that there was no “ends-of-justiee” finding entered into the record, despite the statute’s requirement that such a finding be made by the trial judge. See § 3161(h)(7)(A); Zedner, 547 U.S. at 507, 126 S.Ct. 1976. In constructing such a finding, the district court need not recite a formulaic incantation of the “ends-of-justice” language, but it must articulate clearly the reasons that support an ends-of-justice continuance. See Zedner, 547 U.S. at 506-07, 126 S.Ct. 1976 (holding that “the Act requires express findings,” and that a mere “passing reference to [a] case’s complexity” would be an insufficient basis for an ends-of-justice continuance); United States v. Pakala, 568 F.3d 47, 60 (1st Cir.2009) (“[A] district court must make on the record findings justifying the grant of any ‘ends of justice’ continuance.”).
Here, it is far from clear that the limited STA references in the May 25 and June 28 pretrial conference minutes (and conspicuously absent from the August 6 and November 9 minutes) — which respectively tolled the Act only until “the next pretrial conference” — would function as an *41 adequate basis for a § 3161(h)(7) exclusion of either of the contested periods between August 21 and November 29. Absent the requisite ends-of-justiee findings, we may not apply § 3161(h)(7) retrospectively. See Zedner, 547 U.S. at 506, 126 S.Ct. 1976 (rejecting the government’s argument that the required ends-of-justice finding could be supplied ex post facto on remand).
As an alternative basis for exclusion, the government contends that plea negotiations constitute non-enumerated “other proceedings” pursuant to § 3161(h)(1). Thus, the government argues, because the parties engaged in sporadic plea negotiations between August 21 and November 29, 2004, the corresponding timeframes should be automatically excluded from the STA’s seventy-day calculus. To the extent that other circuits have considered the issue of whether plea negotiations fall within the ambit of § 3161(h)(l)’s “other proceedings” clause, they are divided.[7]
Although we have yet to squarely address this issue, it is not necessary for us to do so here, as Valdivia has waived, or at least forfeited, his STA claim. Generally, under the Act, a defendant’s failure to move for dismissal of the charging instrument prior to trial “shall constitute a waiver of the right to dismissal.” 18 U.S.C. § 3162(a)(2). While an issue not raised in the district court is typically reviewed for plain error on appeal, see Fed.R.Crim.P. 52(b), under the STA the failure to move to dismiss the indictment constitutes a waiver, rather than a forfeiture. United States v. Rodríguez-Durán, 507 F.3d 749, 768 (1st Cir.2007); United States v. Spagnuolo, 469 F.3d 39, 45-46 (1st Cir.2006).
Moreover, courts have held that even where a defendant timely files a motion to dismiss under the Speedy Trial Act, his failure to identify specific arguments will result in a waiver of those arguments on appeal. See, e.g., United States v. Seals, 450 Fed.Appx. 769, 771 (10th Cir.2011) (“[W]e may not conduct any review of Speedy Trial Act arguments unraised below, not even for plain error.... [N]ot only must the defendant seek dismissal [on STA grounds] prior to trial, but he must do so for the reasons he seeks to press on appeal.”); see also United States v. O’Connor, 656 F.3d 630, 638 (7th Cir.2011) (finding forfeiture at a minimum, but noting that “the text of § 3162(a)(2) — read as a whole and in light of the [Supreme] Court’s language in Zedner — strongly suggests that violations not specifically identified in the defendant’s motion to dismiss are waived, not forfeited”); United States v. Oberoi, 547 F.3d 436, 458 (2d Cir.2008), vacated & remanded on other grounds, — U.S. -, 130 S.Ct. 1878, 176 L.Ed.2d 356 (2010).
In the district court, Valdivia asserted in his pretrial motion to dismiss that an entirely separate 104-day period from October 26, 2005 through his trial date of February 6, 2006 was not excludable under the STA, a claim which the district court summarily denied, and that Valvidia now concedes. Nowhere in the motion did Valdivia identify the periods of time that he now purports to challenge as non-excludable; accordingly, there is a strong basis for finding the argument *42 waived.[8]
Even if his challenge has not been waived, but merely forfeited, Valdivia cannot establish plain error. See United States v. Turbides-Leonardo, 468 F.3d 34, 38 (1st Cir.2006) (forfeiture of an argument compels plain error review). As we have yet to address whether plea negotiations are automatically excludable under § 3161(h)(1), and there is no consensus among the circuits on the issue, we are not inclined to find that the district court’s failure to identify, sua sponte, the violation that Valdivia presses before us was “clear or obvious,” if error at all. See United States v. Marino, 277 F.3d 11, 32 (1st Cir.2002) (declining to find plain error where the law was unsettled); United States v. Diaz, 285 F.3d 92, 97 (1st Cir.2002) (where law on issue was unsettled in First Circuit and other circuits were split, error could not be deemed “plain”). Consequently, we reject Valdivia’s Speedy Trial Act claim.
B. Judicial Commentary and Jury Instructions
The appellant next alleges that at various junctures, the district court inaccurately and prejudicially commented on the evidence, thus skewing the proceedings and depriving him of an impartial trial. Specifically, he contends that, in making several remarks during trial and in issuing instructions, the trial judge (1) bolstered the perceived strength of the government’s case, (2) assumed the otherwise contested identification of Valdivia’s voice on certain wiretap recordings, and (3) presaged the present appeal, thereby implying the judge’s expectation of a conviction. We address these claims in turn.

1. Strength of the Evidence

As part of its case-in-chief, the government presented evidence — including the testimony of a Drug Enforcement Agency (D.E.A.) chemist, and a copy of the chemist’s forensic laboratory report — to show that the substance possessed by Giovani Castro upon his arrest, and intended for delivery to Valdivia, was in fact heroin. Because the substance itself had been destroyed by the government prior to trial, defense counsel objected that the chain of custody was deficient, leading to the following exchange with the trial judge in front of the jury:
Defense Counsel: The case against my client relies on [the drugs seized from Castro on October 9, 2001]. [ ... ]
Court: Partially. It does partially, because even if the drugs do not exist ..: there is plenty of other evidence here, if the jury believes it, to convict your client.
Defense Counsel: [ ... ] What can we do with [destroyed] evidence and ... partial testimony?
Court: Sir, if I eliminate the drugs [found on Castro], the case still goes against your client, based on the testimony of all the other witnesses. [ ... ] And then the jury will decide.
The court then excused the jury at the government’s request, and further explained:
[T]o make matters very clear, even if the Court eliminates the [drugs found on Castro] and gives an instruction to the jury to disregard the transaction of [Castro], this case still goes to the jury because there was plenty of evidence *43 provided by the cooperator that he provided heroin to ... and collected from [Valdivia].
Upon its return, the jury was instructed that the chain-of-custody issue raised by defense counsel affected only the weight, and not the admissibility, of the chemist’s testimony.
At the beginning of the next trial day, the judge prefaced his issuance of a lengthy superseding instruction by noting that, “last [trial day], ... there was a discussion between counsel [and with the Court] as to the law ... and I am going to ... order you to disregard anything that you may have heard as to that discussion[,] and the instruction [from] that day is ... superseded by this instruction....” To eliminate any “created confusion,” the court then proceeded to define the elements of criminal conspiracy, explaining in pertinent part:
[S]ince overt acts are [no longer a] necessary [element of conspiracy], the ... physical presence of drugs is not required, because that would be an overt act. [In] this case, however, the [government] has chosen to prove overt acts. And there have been many overt acts allegedly testified. And you will provide credible [sic], yes or no, as to those overt acts. And I am ordering that you ... are not to decide credibility until the end of the case when you have all of the evidence in. Examples of overt acts are the fact that drugs came in ... tires of bicycles[J ... whether or not a person went to charge for the drugs, and whether or not a person went to deliver the drugs. All of those are overt acts. [ ... ] The defense can challenge [the overt acts], and it will be up to you to decide whether or not the [government] has proven [them].
(emphasis added). According to Valdivia, the judge’s comments and the highlighted portions of the instructions fostered the impression that the court had prematurely concluded that the evidence was sufficient, effectively usurping the jury’s ability to weigh it for proof of guilt. We disagree.
A trial judge is the “governor of the trial for the purpose of assuring its proper conduct, and has a perfect right— albeit a right that should be exercised with care — to participate actively [at trial].” Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir.1997) (internal citation omitted). Trial judges in the federal system thus retain the power to “analyze, dissect, explain, summarize, and comment on the evidence,” so long as their participation is balanced, and does not render unfair advantage to either party. Id. Ultimately, an inquiry into the propriety of a judge’s actions in this regard will turn on whether the complaining party can show serious prejudice. See United States v. González-Soberal, 109 F.3d 64, 72 (1st Cir.1997).
After a painstaking review of the trial record, we conclude that the judge’s actions did not amount to reversible error. As a preliminary matter, all of the challenged statements and instructions were provided with a single purpose in mind: to resolve any confusion caused by defense counsel’s assertion, in the presence of the jury, that the unavailability of the substance in Castro’s possession was somehow dispositive of the government’s case. The court was merely attempting to clarify the elements necessary for a finding of guilt. See United States v. Quesada-Bonilla, 952 F.2d 597, 600-01 (1st Cir.1991) (failing to find prejudice in part because “defense counsel ... provoked the court’s comment”).
There is little doubt that, in doing so, some of the language employed — “there is plenty of other evidence ... to convict your client,” and “the case still goes against your client” — if considered in iso *44 lation, could give a reviewing court some pause. But we cannot read such words as singular, insular statements; rather, we must gauge them in light of the overall record. Logue, 103 F.3d at 1046; United States v. Richman, 600 F.2d 286, 296 (1st Cir.1979). Properly viewed in that broader context, the contested statements were contemporaneously tempered by qualifying language like “if the jury believes it” and “then the jury will decide,” and any lingering untoward effects were almost certainly cured by the court’s mandate to disregard the remarks, and its numerous and explicit reminders that the jury alone retains the exclusive function of judging the facts. See United States v. Candelaria-Silva, 166 F.3d 19, 36 (1st Cir.1999) (holding that jury instructions are a useful means of allaying potential prejudice). Thus, the court’s commentary, though in some instances perhaps inartfully constructed, did not substantially taint the proceedings.
We similarly fail to discern any error as to the substance of the court’s curative instruction on the elements of conspiracy. The use of evidentiary exemplars from the body of existing trial evidence to illustrate the meaning of “overt acts” was not improper; we have repeatedly stated that the “trial judge is not limited to instructions in the abstract. The judge may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles.” United States v. Maguire, 918 F.2d 254, 268 (1st Cir.1990) (internal citation omitted). This is precisely what the court did: incorporate the evidence in order to explicate the governing law. In plumbing any other meaning, the appellant is most assuredly overreaching.

2. Voice Identification

The appellant’s second claim of inappropriate conduct fares no better. Faced with the proffer of recordings from the Aruban wiretap investigation, defense counsel objected, questioning the authenticity of the tapes and submitting that there was insufficient foundational proof that the voice was indeed that of the defendant. The court, in addressing the objection at some length, made the following remark before the jury, which the appellant now urges must result in vacating his conviction:
Whether [the tapes are] going to be played to the jury, remember what I said, please.... The jury is not going to hear any of this until I’m satisfied that those tapes contain Mr. Valdivia, and whether or not I can — somebody can identify his voice.
(emphasis added). Valdivia submits that the court’s subsequent admission of the recordings, in conjunction with this statement, left the jury with little choice but to conclude that the voice on the tapes belonged to him.
As noted above, in determining the prejudicial effect of such a statement, we review it not independently, but as part and parcel of the record in its entirety. Logue, 103 F.3d at 1046; Richman, 600 F.2d at 296. That record, upon closer inspection, divulges meaningful pieces of the exchange that were omitted from the appellant’s brief. For example, almost immediately prior to the contested statement, the court opined:
[T]his Court ... will not allow any arguments, relating to any other tape but the tape of Mr. Valdivia if somebody identified the voice of Mr. Valdivia. So whatever happened that may be in that tape ... relating to any other person other than Mr. Valdivia, ... I’m not going to allow [it]. [ ... ] [T]he only tapes [to] be played and produced in evidence will be the tapes of the Defendant if some *45 body ... properly identified the tapes of the Defendant. [ ... ] [T]he only case I have is if somebody identifies the tapes, that this José Valdivia is him. And I don’t know if it will be, because it will be the jury that will decide if the voice identification made is reliable to them. It’s not going to be me, it’s going to be ultimately the jury.
(emphasis added). A short time later, the court continued:
[T]he Court admits the tape, subject to the weight the jury may provide because ... the fact that the Court accepts a document does not mean that you have to provide it weight. The weight will depend on the credibility and the defendant may attack the weight of the [tape]. [ ... ] The Defendant is not precluded and can challenge the ... tape.
These statements, and the court’s many admonitions to reserve judgment until all of the evidence had been presented, were enough to ameliorate any perceived impropriety. See Rickman, 600 F.2d at 296 (holding that similar instructions to the jury “effectively cured whatever error had been made”).[9]

3. Predicting the Appeal

The appellant’s final charge of prejudicial commentary, which he raises for the first time on appeal, need not detain us. Confronted on several occasions with the need for English translations, the court noted that such translations were required “for appeal purposes,” and reflected on the importance of “making a proper record for appeal.” The appellant’s brief is devoid of any developed argumentation on the issue, offering only an oblique suggestion that, “in conjunction with the other prejudicial remarks,” the comments “warrant closer consideration.” Such sparse elaboration falls far short of the development required for consideration on appeal, and we could reject the claim on this ground alone. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990) (holding that “issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived”).
Moreover, the record here reflects a wholly rational explanation for the court’s references. As we have said, “it is clear, to the point of transparency, that federal court proceedings must be conducted in English____ [And] parties are required to translate all foreign language documents into English.” United States v. Rivera-Rosario, 300 F.3d 1, 5, 7 n. 4 (1st Cir.2002). Normally, the submission of foreign documents unaccompanied by English translations is error, and such documents would not be considered on appeal. See United States v. Contreras Palacios, 492 F.3d 39, 43 n. 7 (1st Cir.2007). The court, in neutrally referencing the preservation of the record, was merely explaining to the jury the significance of the translations in light of these stringent rules. Such comments were not impermissible, let alone prejudicial.
C. Hearsay, Overview, and Bolstering Testimony
In the first of several evidentiary challenges, Valdivia contests the admission of certain testimony from three of the government’s primary witnesses: Immigration and Customs Enforcement agent Eliu Estrada, who interrogated the courier Giovani Castro after his October 2001 arrest; D.E.A. agent Vincent Carpió, who supervised the American investigation of *46 Valdivia’s activities; and Jan Meulenberg, the Aruban officer who spearheaded the De Sousa wiretap operation. We review the preserved challenge to Estrada’s testimony for abuse of discretion, but because the appellant failed to raise contemporaneous objections to the statements of Carpió and Meulenberg, we review the court’s decision to admit that testimony only for plain error. See United States v. Brown, 669 F.3d 10, 21-22 (1st Cir.2012). If any of the identified testimony was improperly admitted, we may still “affirm [the] judgment of conviction where the government has met its burden of showing that any such error was harmless beyond a reasonable doubt.” United States v. Cabrera-Rivera, 583 F.3d 26, 36 (1st Cir.2009) (internal citation omitted).

1. Testimony of Agent Estrada

On the first day of trial, Agent Estrada provided a comprehensive account of Castro’s arrest, which included several of Castro’s post-arrest statements. For example, as recounted by Estrada, Castro “explained that he [had been] approached in Aruba by an individual called ... José, to see if he wanted to bring some narcotics into the United States,” and provided authorities with a detailed description— reproduced by Estrada on the stand — of the process by which he was fitted for and supplied with the drugs for delivery to Valdivia. The appellant now contends, as he did below, that this testimony constituted inadmissible hearsay, which the trial court erroneously admitted under the co-conspirator exception to the hearsay rules. See Fed.R.Evid. 801(d)(2)(E) (providing that a statement will be excluded from the rules of hearsay where it “was made by the party’s co-conspirator during and in furtherance of the conspiracy”).
The government concedes the point, acknowledging that the statements were not made in furtherance of the alleged conspiracy. Instead, the government makes a somewhat strained argument that the testimony was admissible for the non-hearsay purpose of providing context or background to show the basis for the government’s actions. Put another way, the government would have us believe that it meant for the jury to take Castro’s statements, as recalled by Estrada, only for the fact that he made them, and not for their truth. We need not reach the merits of the government’s alternative argument, however, because we find that the admission of this material, if erroneous, was harmless error.
Even if the challenged testimony was inadmissible hearsay, the source of the out-of-court statements — Giovani Castro— later testified himself, and was subject to thorough cross-examination by defense counsel. He largely corroborated Estrada’s account, repeating many of the same details, and the few discrepancies were adroitly incorporated by the defense to undermine the credibility of both witnesses. In short, the purported hearsay testimony is cumulative of other evidence in the record, and the error in admitting the statements under the co-conspirator exception was harmless. See United States v. Piper, 298 F.3d 47, 58 (1st Cir.2002) (“Cumulative evidence is typically regarded as harmless.”).

2. Testimony of Agent Carpió and Officer Meulenberg

In a quite different claim of error, Valdivia relies on several of our recent cases to assert that various statements from witnesses Carpió and Meulenberg amounted to improper “overview” testimony. See, e.g., United States v. Meises, 645 F.3d 5 (1st Cir.2011); United States v. Flores-De-Jesús, 569 F.3d 8 (1st Cir.2009); United States v. Casas, 356 F.3d 104 (1st Cir. *47 2004). Because the argument was not preserved below, we review it now through the lens of plain error.[10] See United States v. Andújar-Basco, 488 F.3d 549, 554 (1st Cir.2007). To prevail under this standard, the appellant must demonstrate that there was a clear or obvious error that seriously affected not only his substantial rights, but also the fairness, integrity, or public reputation of the judicial proceedings. Id.
In its problematic form, overview testimony comprises declarations by a witness — most commonly a law enforcement officer involved in the relevant investigation — presented in the early phases of a criminal trial to describe the government’s general theory of the case. See United States v. Vázquez-Rivera, 665 F.3d 351, 356 (1st Cir.2011); Meises, 645 F.3d at 14 n. 13 (noting that such evidence “often provides an anticipatory summary of the prosecution’s case by previewing the testimony of other witnesses”). Because the witness is, in essence, testifying about the results of a criminal investigation before the government has presented any evidence — often including aspects of the investigation in which he did not actually participate — we have repeatedly admonished the use of such testimony. United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir.2010). Specifically, we have cautioned that “the evidence promised by the overview witness [might] never materialize[ ],” and that even if it does, the testimony still “represents a problematic endorsement of the veracity of the testimony that will follow.” Vázquez-Rivera, 665 F.3d at 356 (internal citation omitted).
Although the questionable use of overview witnesses has become something of a troubling trend, see Flores-De-Jesús, 569 F.3d at 17, the declarations at issue here are largely distinguishable from those that we have previously considered problematic. On the second day of trial, Agent Carpió testified that “De Sousa was bringing drugs into the island of Aruba for further distribution into different areas in the Caribbean, including the United States, Puerto Rico, and Europe,” and was “smuggling the proceeds ... back [to] Aruba.” In a similar vein, halfway through trial, Officer Meulenberg testified that he “was the leader of the group that ... investigated] a group of persons led by [De Sousa],” and explained that “[De Sousa] was ... buying drugs in Colombia and Venezuela and selling drugs, not only to the local market but to the American ... and European markets].” He also testified that the potential involvement of an airport security guard, a cruise-ship official, and a police officer in the suspected criminal activities was a major impetus for the investigation.
Unlike prior cases where we have criticized the use of overview witnesses, the prosecution here laid a sufficient foundation that both Meulenberg and Carpió had personal knowledge of the alleged conspiracy. Officer Meulenberg testified that he led the Aruban investigation of drug activity involving De Sousa, assisted in preparing the report submitted to obtain the Aruban wiretap, participated in wiretap surveillance, and conducted the arrests and home searches of several of the conspiracy’s participants, including De Sousa. Similarly, Carpió testified that he was the American liaison to the Aruban investigation, that he reviewed the wiretap recordings and pertinent telephone records, *48 which were ultimately entered into evidence, and that he had conducted his own independent investigation of Valdivia’s role in De Sousa’s activities. Thus, far from being a scripted “overview” of the government’s case by uninvolved agents, the testimony represented the fruits of first-hand police work. See Rosado-Pérez, 605 F.3d at 55-56 (concluding that the prosecution had laid a sufficient foundation of personal knowledge where the testifying agent “was the lead investigator ... and ... participated in video and personal surveillance, wiretap surveillance, and controlled drug buys”).
To the extent that Carpió and Meulenberg described the cast of characters as an “organization” or “group” — a characterization, as we have noted, to which the appellant did not object — any misstep was heavily outweighed by the substantial evidence of the appellant’s guilt, which included wiretap recordings, phone records, and co-conspirator testimony, among other things. See, e.g., Flores-De-Jesús, 569 F.3d at 27-31 (finding the use of overview testimony ameliorated in part by the substantial evidence of defendant’s guilt). As such, we find that the admission of this testimony was not plainly erroneous.

3. Bolstering

On three occasions during the government’s case, the prosecutor elicited testimony from agents Estrada and Carpió that they had “corroborated” or “verified” various aspects of their investigation, including the content of certain statements made by co-conspirators Giovani Castro and Jeffrey Grueninger. Although Valdivia failed to properly object to this testimony at trial, he now contends that it constituted a form of due process violation known as bolstering. The argument, for the reasons elucidated below, is unavailing.
Generally, “[bolstering occurs when [a] prosecutor implies that [a] witness’s testimony is corroborated by evidence known to the government but not known to the jury.” United States v. Francis, 170 F.3d 546, 551 (6th Cir.1999); see also United States v. Balsam, 203 F.3d 72, 88 (1st Cir.2000) (noting that a prosecutor may not “indicate that facts outside the jury’s cognizance support the testimony of the government’s witnesses”). While prosecutors can commit improper bolstering during argument to the jury, the issue may also arise through the testimony they elicit from other government witnesses on direct examination. United States v. Rosario-Díaz, 202 F.3d 54, 65 (1st Cir.2000). Here, the appellant asserts that the contested statements improperly bolstered the prosecution’s case by suggesting to the jurors that the government had undisclosed evidence which independently supported the existence of the charged conspiracy. Because the evidence underlying each of the three purported instances of bolstering was ultimately presented to the jury, however, the testimony did not run afoul of Valdivia’s due process rights. We explain briefly.
In the first instance, Agent Estrada testified that he was able to “corroborate” that the “Jos” identified by Castro as his point of contact in Puerto Rico was indeed José Valdivia. This corroboration, he explained, was enabled in part by information obtained from subpoenaed phone records, which were subsequently entered into evidence. In the second instance, Estrada later testified that during the course of the investigation, he was able to “determine” that two different men named “Jos” were pertinent to the conspiracy. The sources for this determination, which can be divined from the surrounding testimony — including phone records and information from at least one witness — were later presented for the jury’s consideration. In *49 the third and final instance, Agent Carpió testified that “[a]fter the arrest of [Jeffrey] Grueninger in Miami, we were able to debrief him and help him identify the voices on the [Aruban wiretap tapes], and that’s how we obtained the identification of Mr. Valdivia later on, how we were certain who he was.” The recordings to which Carpió alluded were all played for the jury-
In order for a criminal defendant to establish a colorable claim of bolstering, the challenged statements must do more than simply “bolster” the government’s case. Criminal prosecution is, after all, nothing more than the use of evidence to bolster the government’s allegations of criminal conduct. The potential for impropriety emerges only when such bolstering is predicated upon unsubmitted evidence, thereby implying some indicia of reliability on the basis of materials that may or may not exist. See Francis, 170 F.3d at 551 (noting that “bolstering” occurs under the implication that “testimony is corroborated by evidence known to the government but not known to the jury ”) (emphasis added). Here, in every instance, the evidence supporting the “corroborations]” and “deter-min[ations]” was eventually put before the jury. Thus, whatever objections Valdivia might have been able to raise against these lines of questioning, bolstering is not one of them.
To the extent that the appellant alternatively characterizes this challenged testimony as improper witness vouching, the argument misses the mark. A prosecutor (or government witness) improperly vouches for a witness when she “impart[s] her personal belief in a witness’s veracity or implfies] that the jury should credit the prosecution’s evidence simply because the government can be trusted.” United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir.2003). The conduct of the witnesses here does not fit the bill. They did not testify that Castro and Grueninger were truthful, honest, or reliable, or that their statements should be believed because of their affiliation with the government. Rather, they confirmed, through independent sources, the veracity of certain facts attested to by the cooperating witnesses, conduct that is conceptually distinct from witness vouching.[11]
D. Agent Carpio’s Lay Witness Testimony
During trial, the government introduced evidence linking Valdivia to one of the two phone numbers found in Giovani Castro’s possession at the time of his arrest, which referenced only the name “Jos.” That evidence included, inter alia, testimony from the issuing phone company’s custodian of records, who explained that while the account’s subscriber was an inconsequential third party, its registered user name was in fact “Jos Valdivia.”
In an effort to undermine this link to his client, defense counsel subsequently cross-examined Special Agent Carpió concerning the fact that a second phone number, found in the possession of another of De Sousa’s couriers, was ascribable to a “Jos” with a different surname — one José Camilo. On redirect examination, the prosecutor and Carpió engaged in the following colloquy over the objection of defense counsel:
Prosecutor: According to your experience as a narcotics investigator, how ... *50 does a telephone number registered in the name of a person compare with the practice of money traffickers of putting their telephone numbers in the names of third parties?
S.A. Carpió: Based on my training and experience, whenever traffickers utilize cell phones, they try to disguise names by placing it into somebody else’s name, or there are phone companies that allow you to give names without any proper identification. Therefore, masking the real user of the telephone.
Valdivia now challenges the admission of this testimony on two grounds: (1) that the district court erred in permitting Carpió to cross the line from fact witness to expert witness without the appropriate qualification and prior notice, see Fed.R.Crim.P. 16(a)(1)(G), 26(a)(2); and (2) that even if Carpio’s statements were properly characterized and admitted as expert testimony, they constituted “unwarranted and unreasonable use of [such] testimony about matters within the ordinary comprehension of jurors.” We review the admission of lay opinion and expert testimony for manifest abuse of discretion. United States v. Lizardo, 445 F.3d 73, 83 (1st Cir.2006); United States v. Montas, 41 F.3d 775, 783 (1st Cir.1994).
The admissibility of lay opinion testimony is governed by Federal Rule of Evidence 701, which provides:
If a witness is not testifying as an expert, testimony in the form of [opinions or inferences] is limited to [those which are] (a) rationally based on the witness’s perception; (b) helpful to clearly understanding the witness’s testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.
Fed.R.Evid. 701 (emphasis added). Valdivia claims primarily that, as “scientific, technical, or other specialized knowledge,” Carpio’s testimony contravenes prong (c) of Rule 701. That prong, appended to the rule by amendment in 2000, was intended to “eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.” Fed.R.Evid. 701, Advisory Committee’s note to the 2000 amendments. While such sentiment is expedient in the abstract, the line between expert testimony under Rule 702 and lay opinion testimony under Rule 701 is, in practice, “not [an] easy [one] to draw.” United States v. Colón Osorio, 360 F.3d 48, 52-53 (1st Cir.2004); see also United States v. Hilario-Hilario, 529 F.3d 65, 72 (1st Cir.2008) (“There is no bright-line rule to separate lay opinion from expert witness testimony.”). Indeed, as we have previously noted, “the same witness — for example, a law enforcement officer — may be qualified to ‘provide both lay and expert testimony in a single case.’ ” United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir.2005) (quoting Fed.R.Evid. 701, Advisory Committee’s note). The statements proffered by Special Agent Carpió, however, do not straddle that hazy line, but rather fall comfortably within the boundaries of permissible lay opinion testimony.
It required no scientific or technical expertise within the scope of Rule 702 for Carpió to conclude, based on his experience in prior drug investigations, that traffickers often list unrelated third parties as their telephones’ subscribers, and that, in this case, the phone account at issue was organized under a similar scheme. Such testimony was a product of Carpio’s requisite personal knowledge, see Fed.R.Evid. 602, and also met the requirements of Rule 701, because it was derived from “particularized knowledge that [Carpió had obtained] by virtue of his ... *51 position” as a drug enforcement agent tasked with investigating the De Sousa narcotics ring, Fed.R.Evid. 701, Advisory Committee’s note. The district court therefore properly exercised its considerable discretion in admitting Carpio’s testimony pursuant to Rule 701. See United States v. Maher, 454 F.3d 13, 24 (1st Cir.2006) (holding that an officer’s testimony that, based on his experience, certain post-it notes were likely drug orders and the number “4” likely referred to a quantity of the drug found by law enforcement “did not cross the line to become expert testimony”); Ayala-Pizarro, 407 F.3d at 29 (finding that an officer’s testimony that heroin seized at drug points was typically packed in aluminum decks and that the heroin seized in the case was packaged in such decks was Rule 701 testimony).
That Carpio’s testimony was of the lay opinion variety necessarily precludes Valdivia’s second argument, that the use of an expert was improper. Because the argument also fails on the merits, however, we will address it briefly.
We have held, as Valdivia notes, that where expert testimony on a subject is “well within the bounds of a jury’s ordinary experience,” the risk of unfair prejudice outweighing probative value is not improbable. See Montas, 41 F.3d at 781-84. In essence, the appearance of an expert’s imprimatur upon the government’s theory might unduly influence the jury’s assessment of the inference being urged. Id. at 783-84. We are not faced with such a scenario here. For one thing, the challenged testimony was elicited by the government in direct response to defense counsel’s line of questioning. The appellant, under the circumstances presented, cannot earnestly question the government’s attempt to re-forge inferential links that he himself sought to sever. More importantly, the testimony was not so obviously within the jury’s bounds of knowledge as to negate all probative value. The average juror may not be aware that some phone companies permit account subscriptions without the presentation of identification, nor might some jurors know that such a scheme is a common tactic for drug traffickers to conceal their identities. Accordingly, we find no abuse of discretion.
E. Failure to Suppress the Aruban Wiretap Evidence
We next consider the appellant’s suppression claim. Immediately following the jury’s verdict, Valdivia filed a motion for judgment of acquittal and/or a new trial, see Fed.R.Crim.P. 29, arguing in part that the Aruban wiretap violated his Fourth Amendment rights, and evidence derived therefrom should have been suppressed under the exclusionary rule.[12] We review de novo the district court’s denial of Valdivia’s Rule 29 motion. United States v. Troy, 583 F.3d 20, 24 (1st Cir.2009).
Ordinarily, the Fourth Amendment’s exclusionary rule does not apply to foreign searches and seizures, for “the actions of an American court are unlikely to influence the conduct of foreign police.” United States v. Hensel, 699 F.2d 18, 25 (1st Cir.1983). There are, however, two well-established exceptions to this rule: (1) where the conduct of foreign police shocks the judicial conscience, or (2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts. United States v. Mitro, 880 F.2d 1480, 1482 (1st Cir.1989).
*52 Valdivia has not alleged, nor is there any indication, that the conduct of Aruban authorities in this instance might shock the judicial conscience; instead, Valdivia relies on the latter exception — commonly referred to as the “joint venture” doctrine— claiming that the combined investigatory efforts of Aruban and American agents brings the challenged wiretap evidence within the exclusionary purview of the Fourth Amendment. We are not convinced.
At its core, Valdivia’s argument rests on three factual propositions: (1) that Special Agent Carpió, an American D.E.A. agent, was present in Aruba for significant portions of the wiretap investigation; (2) that Agent Carpió testified at trial concerning “our intercept investigation of the [trafficking] organization ... in Aruba”; and (3) that the district court acknowledged, in its order denying Valdivia’s Rule 29 motion, that “there is no doubt that the United States participated in something called investigation by wiretapping in Aruba.”
Putting aside, for the moment, the questionable weight of these three propositions, we first recount the following panoply of countervailing facts, which are plainly evident from the record: Aruban authorities had already initiated the investigation of De Sousa prior to the arrival of any American law enforcement personnel; the wiretap was neither requested nor in any way organized or managed by agents of the United States; the wiretap orders were sought from and approved exclusively by Aruban courts; and only Aruban officers actively participated in the implementation of wiretaps and recording of conversations — indeed, American agents were permitted neither to enter the recording room nor listen to the recorded conversations while the investigation was ongoing. It was only after the investigation had concluded that Agent Carpió, through official government channels, requested an authorized copy of the recordings for purposes of domestic prosecution.
‘ While Carpió did, in fact, characterize the operation as “our intercept investigation,” he later clarified that he did so to justify his presence in Aruba, which required authorization by his administrative superiors at the Drug Enforcement Agency. Moreover, although Carpió and other agents were present in Aruba during periods of the wiretap investigation, they were not active participants in the operation, did not carry guns, badges, or retain the authority to make arrests, and often worked on other unrelated cases.[13]
Thus, as clearly evinced by the record, the involvement, if any, of American agents in the Aruban wiretap investigation was minimal, and certainly not sufficient to support an application of the joint venture exception. Sans the exclusionary hook of the Fourth Amendment, Valdivia’s suppression claim is without merit. See, e.g., United States v. LaChapelle, 869 F.2d 488, 490-91 (9th Cir.1989) (holding that the joint venture exception did not apply where the foreign official who conducted the foreign investigation “stated explicitly ... that American agents were not involved in initiating or controlling the contested [foreign] wiretap”).
F. Sentencing Challenges
We turn, finally, to the appellant’s request for resentencing. At the disposition *53 hearing, the district court found Valdivia personally responsible for thirty kilograms of heroin, resulting in a base offense level (BOL) of 38. See USSG § 2Dl.l(c)(l). The court then augmented the BOL by two levels, finding that the appellant had exercised managerial authority over another participant in the criminal activity. See USSG § 3Bl.l(c). The adjusted offense level of 40, coupled with the absence of any previous criminal history, yielded an advisory guideline range of 292-365 months. Taking into account the dearth of prior criminal activity, the avoidance of any violent conduct, and Valdivia’s obvious repentance, the district court applied a significant downward variance, imposing a total incarcerative term of 210 months.
Valdivia advances two assignments of error. First, he contends that the district court found him responsible for an excessive quantity of drugs, arguing that, at most, thirteen kilograms of heroin are attributable to him on the record, only one kilogram of which was seized (during Castro’s October 2001 arrest). Second, he posits that the court should not have assigned him a managerial role where he never actually controlled any of his cohorts. Such fact-bound procedural claims are reviewed for clear error. See United States v. Rivera Calderón, 578 F.3d 78, 99 (1st Cir.2009); United States v. Santos, 357 F.3d 136, 142 (1st Cir.2004). Thus, unless, on the entirety of the evidence, we are left with the definite and firm conviction that a mistake has been committed, the sentence must be upheld. Rivera Calderón, 578 F.3d at 99-100.
We look first at drug quantity, which is an important factor in establishing a defendant’s base offense level. See United States v. Sepulveda, 15 F.3d 1161, 1196-97 (1st Cir.1993). Where, as here, the government asserts that the amount of drugs seized understates the true scale of the offense, the court must employ every tool at its disposal to discern a reasonable approximation of the weight of the controlled substances for which a particular defendant should be held responsible. United States v. Eke, 117 F.3d 19, 23 (1st Cir.1997). In making this assessment, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, or similar transactions in controlled substances by the defendant. See USSG § 2D1.1, application note 12. The court may also rely solely on the testimony of cooperating government witnesses, provided such testimony exhibits some indicia of reliability or support from the record. Rivera Calderón, 578 F.3d at 100; see Eke, 117 F.3d at 24. Ultimately, the sentencing court need only support a drug quantity determination by a preponderance of the evidence, and any approximation will be upheld as long as it represents a reasoned estimate. Santos, 357 F.3d at 141.
The district court, in arriving at its calculation of thirty kilograms, relied principally on three sources from the evidentiary record: (1) the testimony of government witness Jeffrey Grueninger, De Sousa’s closest and perhaps most knowledgeable associate, who averred in considerable detail that at least a substantial portion of the 120-125 kilograms of heroin shipped to Puerto Rico during the relevant time frame was, in fact, destined for Valdivia; [14] (2) the testimony of government *54 witness Giovani Castro, who corroborated Grueninger’s testimony in several respects, and confirmed that, on more than one occasion, he made sizable deliveries to Valdivia in Puerto Rico; and (3) recorded telephone conversations, during which various members of the criminal enterprise, including Valdivia himself, discussed topics from which some quantum of drug movement might be surmised. In light of this evidence, and accounting for the potential puffery of cooperating witnesses, the court settled on thirty kilograms, significantly below the amount attributed to Valdivia by the government.
The appellant condemns the court’s reliance on these sources, characterizing them as uncorroborated and generally insufficient — yet he offers no contrary proof, nor does he assail the credibility of either of the cooperating witnesses. To be sure, our cases require caution in estimating drug quantity, and we must take special care, where quantity can drastically alter the severity of a defendant’s sentence, to “ensure that [such] findings are predicated on reliable information.” United States v. Rivera-Maldonado, 194 F.3d 224, 233 (1st Cir.1999). Ideally, a successful drug investigation would include the seizure of strong evidence such as detailed ledgers apportioning quantities to each criminal participant. Such is rarely the case, however. Under the present circumstances, given the consistent and mutually reinforcing testimony of Grueninger and Castro, buttressed by the content of multiple recorded telephone conversations, the sentencing court acted within its proper province in finding these to be reliable sources. Thus, based on the record before us, we cannot say that the court’s quantity estimate was clearly erroneous.
Valdivia next challenges the district court’s determination that he was an organizer, leader, or manager of the alleged criminal activity, which resulted in a two-level upward adjustment. His challenge lacks force.
The relevant sentencing guideline prescribes a two-level enhancement if the underlying criminal activity involved at least two, but fewer than five complicit individuals (including the defendant), and the defendant, “in committing the offense, ... exercised control over, managed, organized, or superintended the activities of at least one other participant.” United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir.2010); USSG § 3B1.1(c).
The appellant brings a limited claim on appeal, challenging only the element of control. He asserts that the sentencing court erroneously based the enhancement on his “control over the activities of the criminal enterprise rather than over any participants in it.” See United States v. Ramos-Paulino, 488 F.3d 459, 464 (1st Cir.2007) (emphasis in original). The case law is indeed unambiguous that the “management of criminal activities, standing alone, does not constitute a basis for a role-in-the-offense enhancement under section 3B1.1.” Id. Thus, to suggest a lack of managerial liability, Valdivia paints himself merely as an organizer of activities, responsible only for arranging deliveries, sales, and proceed collections. The historical evidence suggests otherwise.
Various excerpts from the record strongly indicate that the appellant directed and controlled at least Pabón and Castro, among others. For example, during several telephone conversations, Pabón opined that he could not authorize amounts, deliveries, or other arrangements without the express consent of Valdivia; *55 and Grueninger, who regularly dealt with both Valdivia and Pabón, described Pabón as Valdivia’s right-hand man. Additionally, on at least one occasion, Valdivia provided telephone numbers to the courier Giovani Castro, with explicit instructions about whom to contact and when to initiate communications.
So long as the district court’s managerial enhancement is based upon reasonable inferences drawn from adequately supported facts, we cannot find it to be clearly erroneous. United States v. Rosado-Sierra, 938 F.2d 1, 2 (1st Cir.1991). So it is here. The record more than adequately supports the inference that Valdivia was not merely an organizer of activities, but a manager of personnel in the Puerto Rico branch of De Sousa’s drug-trafficking network. Consequently, the district court did not clearly err in applying the two-level aggravating role adjustment in this case.
We conclude our sentencing discussion by recalling the not-insignificant fact that the district court adopted a rather substantial downward variance, to the tune of eighty-two months below the minimum recommended by the guidelines, and 150 months below the government’s proposal at the disposition hearing. The sentence was sound, and without more, we discern no basis to disturb it here.
III. Conclusion
Appellate counsel has identified and ably pressed numerous claims in this appeal, and has established that the trial was not perfect. But trials rarely are. The district judge conscientiously addressed the issues presented to him and insured that the defendant was tried fairly. Upon conviction by the jury, the judge properly applied the sentencing guidelines, considered the relevant sentencing factors, and ultimately sentenced Mr. Valdivia to an incareerative term well below the advisory guideline range. There were no reversible errors, cumulatively or otherwise. The conviction and sentence are affirmed.
APPENDIX
18 U.S.C. § 3161(h)(1):
“(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;
(B) delay resulting from trial with respect to other charges against the defendant;
(C) delay resulting from any interlocutory appeal;
(D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
(E) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;
(F) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant’s arrival at the destination shall be presumed to be unreasonable;
(G) delay resulting from consideration by the court of a proposed plea agree *56 ment to be entered into by the defendant and the attorney for the Government; and
(H) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.”

. Valdivia did not assert in the district court his Sixth Amendment right to a speedy trial, nor does he on appeal. He limits the scope of his argument to the statutory prescriptions of the Speedy Trial Act, 18 U.S.C. §§3161-3174, and we limit our analysis accordingly.

. For completeness, the full text of subsection (h)(1) is included in an appendix to this opinion.

. In October 2008, Congress re-designated this provision from 18 U.S.C. § 3161(h)(8) to § 3161(h)(7). While the parties refer to the provision as § 3161(h)(8), we will use the current numbering to avoid the potential for confusion.

. Because the government concedes that sixty-nine days between November 25, 2003 and January 31, 2006 are not excludable from the STA calculation, the inclusion of either of the proposed time periods would be dispositive to Valdivia's STA claim.

. For reasons unclear from the record, it appears that the pretrial conference scheduled for September 23, 2004 was never actually held.

. On March 10, 2004, Valdivia had filed a motion for a bill of particulars. On May 4, 2004, the magistrate judge recommended that the trial judge deny the motion. The government hints that the 209-day period between the issuance of the magistrate judge’s report on May 4, and the filing of the defendant’s objection on November 29, might be excludable on the basis of this pending motion. It is not. See 18 U.S.C. § 3161(h)(1)(D), (h)(1)(H); United States v. Thomas, 788 F.2d 1250, 1257 (7th Cir.1986) (holding that the speedy trial clock begins to run as soon as the magistrate judge files the report and recommendation, and tolls for up to thirty days, upon objection of either party, for the district court to take the matter "under advisement” pursuant to 18 U.S.C. § 3161(h)(1)(H)).

. Compare United States v. Leftenant, 341 F.3d 338, 344-45 (4th Cir.2003) (holding that plea negotiations trigger automatic exclusion pursuant to 18 U.S.C. § 3161(h)(1)); United States v. Van Someren, 118 F.3d 1214, 1218— 19 (8th Cir.1997) (same); United States v. Montoya, 827 F.2d 143, 150 (7th Cir.1987) (same); United States v. Bowers, 834 F.2d 607, 610 (6th Cir.1987) (same), with United States v. Alvarez-Perez, 629 F.3d 1053, 1058 (9th Cir.2010) (holding that plea negotiations do not trigger automatic exclusion pursuant to 18 U.S.C. § 3161(h)(1)); Lucky, 569 F.3d at 107 (same).

. Nor may an argument be made that the issue was raised during trial, as such tardiness also results in waiver. See 18 U.S.C. § 3162(a)(2); Zedner, 547 U.S. at 506, 126 S.Ct. 1976. The argument must be raised prior to trial, and there is nothing in the pretrial record to suggest that the appellant’s current argument was timely proposed.

. We note that the far more preferable forum for these types of exchanges is the sidebar conference, through which virtually any risk of prejudice could have been easily avoided here.

. Although the record was peppered with objections by defense counsel, we are unable to identify any objection to this testimony on the "overview” grounds now presented on appeal. Absent a contrary indication by the appellant, we therefore deem the argument forfeited, and review it for plain error only.

. The term "bolstering” has, on occasion, also been used as a shorthand for the concept of improper witness vouching. Despite some conceptual overlap, the proscription on improper witness vouching should not be confused with the rule against "bolstering” as it is used in cases like Francis and Balsam.

. This claim was also the subject of multiple motions to suppress, a pre-trial order of the district court, and several admissibility raiings during trial. Valdivia, however, elects to raise the issue in the context of his Rule 29 motion.

. We need not formally address the merits of Valdivia’s third factual proposition. The district court, while acknowledging some marginal "participation” by American agents, expressly rejected Valdivia's contention that such participation constituted a sufficient basis for the application of the joint venture doctrine. In any event, in light of our de novo review of the issue, the district court’s statement is inapposite.

. Specifically, Grueninger testified that during the seven-month cruise ship off-season, Valdivia received roughly six kilograms of heroin per month, and during the five-month peak season, he received up to twelve kilograms of heroin per month. Additionally, he testified that smaller deliveries were made by traveling couriers like Giovani Castro on a more regular basis, resulting in a total delivery to Valdivia between October 2001 and *54 April 2003 of more than one-hundred kilograms of heroin.